Drake, Oh. J.,
delivered the.opinion of the court:
Upon the facts as found, the first question is, whether the collision which produced the loss of the Ada A. Andrews was the result of inevitable accident. In such a case, what is inevitable accident ? It is only when the disaster happens from natural causes, without negligence or fault on either side, and when both parties have endeavored, by every means in their power, with due care and caution, and with a proper display of nautical skill, to prevent the occurrence of the accident. (Union Steamship Company v. New York and Virginia Steamship Company, 24 Howard, 307.)
This definition, authoritative to us, settles the question of *492 inevitable accident in this case. No natural cause impelled the Ticonderoga into the Andrews. We must, therefore, ascertain from the facts where the fault lay which produced the collision ; for if it was not an inevitable accident, then-there must have been fault in one or the other vessel, or in both.
Was it on the part of the Andrews? It is impossible, as .between a sailing-vessel and a steamer on the high seas, to impute fault to the former, when, as in this case, she had not steerage-way, and therefore was wholly powerless to avoid any impending danger from the latter; and when she used the only means she had of notifying other vessels of her whereabouts, namely, the fog-horn, which, for forty minutes before the collision, “ was blown constantly at short intervals.”
Hence it-follows that there could not have been fault on the part of both vessels, and that the fault must have been in the Ticonderoga; of which we have no doubt, and which we think cannot be doubted after an inspection of the accompanying-diagram showing the positions of the vessels at the moment she discovered the two schooners, as those positions are stated in the findings; a being the Andrews, b the unknown schooner, .and o the Ticonderoga; and the two schooners being equidistant from each other and from the Ticonderoga, and each of the distances from one to the other being 200 yards. When, therefore, the Ticonderoga sighted the schooners, one but a half a point off her port bow — which is almost dead ahead— and the other broad off her starboard bow, the course of safety, if the steamer could not be instantly stopped, was to port her helm so as to pass between the schooners, as she had abundant room to do. It might even be a question whether, if the steamer had steadily kept her course, she would not have passed ahead of the Andrews, which, though heading across the steamer’s course, was not moving ahead at all, or so little that she had not steerage-way. But whether so or not, it seems to us most clear that if the steamer’s helm had been ported a very little the collision would have been impossible, and this without any danger of striking the unknown schooner. But the deck-officer of the Ticonderoga seems not to have been equal to the emergency, and under the idea of passing astern of the Andrews gave the orders, “ Starboard, hard a starboard,” which were instantly obeyed, and resulted in the Ticonderoga’s running into the Andrews amidships. This was not “ a proper *493 display of nautical skill,” but a fault, and it fixes the liability of the owner of the Ticonderoga. •

Were it necessary to go more extendedly into the discussion of the case, it might be questioned whether it was not negli- *494 gencQ on the part of the steamer’s captain to lie in bed after he hcad been apprised of the existence of the fog, and that there were several schooners on each bow, and the circumstances reported to him justified his saying to the officer who made the report, “Yon will be into some of those vessels, sir.” It might also be questioned whether, under the circumstances, the Ticonderoga’s engines ought not to have been stopped altogether when -the fog came up, and kept at rest till the fog lifted, as they were before and after the collision. And it might furthermore be questioned whether, when the extra lookout reported to the master a steamer’s whistle off the port bow, and the master ran forward to the top-gallant forecastle, he should not, as he went, have signaled to stop the engines. But it is not necessary to discuss these points. The main question is as to the management of the steamer after the schooners were discovered; and that we have decided against the steamer. The liability for the loss of the Andrews rests on her.
This loss, so far as the owners of the Andrews are concerned, was, first, in her value, $18,500; and, second^, in the value of the freight that she would have earned if she had reached her port of destination, $770.85.
None of the interests of the owners were insured, except the one-sixteenth of S. 1). Andrews and the one-sixteenth of E. Kelley, the former for $1,000 and the latter for $700. Each of those interests was of the value of $1,156.25. The recovery of the owners on account of the vessel must be for her whole value, less those insurances, viz, $16,800 ; of which sum only $156.25 should go to said Andrews, and $456.25 to said Kelley, and the rest to the other owners according to their respective interests.
As to the freight, the recovery of the owners of the vessel must be for the full amount thereof, as no evidence was given as to what the expenses of the voyage would have been.
As to the uninsured cargo', Frederick H. Odiorne should recover, for the 228 tons of coal, $1,728; and Jotham D. Otterson, for the 10 tons of pig-iron, $302.50.
As to the insurers who paid losses upon the vessel and cargo, the recoveries should be as follows: The Boylston Fire and Marine Insurance Company of Boston, $5,000; the Union Mutual Insurance Company of Philadelphia, $2,500; the Den *495 nis and Harwich Mutual Insurance Company, $1,000; and the Wellfleet Marine Insurance Company of Wellfleet, $700. The total amount of the several recoveries is $28,809.35.
Judgment for the claimants, according to their several rights, as.thus stated, will be entered.