## OAKES *v.* UNITED STATES.

APPEAL FROM THE COURT OF CLAIMS.

No. 19. Argued April 20, 1898. — Decided May 22, 1899.

Under the act of July 28, 1892, c. 313, conferring jurisdiction on the Court of Claims "to hear and determine what are the just rights in law" of the daughter and heir of Hugh Worthington to compensation for his interest in a steamboat taken and converted into a gunboat by the United States during the war of the rebellion, and, if it "shall find that said claim is just," to render judgment in her favor for the sum found due, the issue to be determined depends upon the question what had been his legal right to such compensation, embracing all questions, of law or of fact, affecting the merits of the claim.

Whether the capture of a steamboat on the western waters within the lines of the Confederate forces in February, 1862, by part of the naval forces of the United States on those waters, commanded by officers of the Navy, and under the general control of the War Department, but no land forces being near the scene of the capture or taking any active part therein, was a capture by the Army — *quære.*

A libel for the condemnation, under the act of August 6, 1861, c. 60, of a steamboat captured and taken into firm possession by naval forces of the United States on the western waters during the war of the rebellion, was filed by the district attorney in the District Court of the United States for a district into which she had been brought; the libel alleged that she

had been seized by a quartermaster, for the reason that she was used with her owners' knowledge and consent in aiding the rebellion, contrary to that act; she was taken into the custody of the marshal under a writ of attachment from the court; notice was published to all persons to appear and show cause against her condemnation, and no one appeared or interposed a claim. *It seems,* that a decree thereupon rendered for her condemnation and sale was valid against her former owners and all other persons.

The act of March 3, 1800, c. 14, § 1, providing that vessels or goods of a person resident within or under the protection of the United States, taken by an enemy and recaptured by a vessel of the United States, shall be restored to the owner on payment of a certain sum as salvage, has no application to property captured by the United States, which had come into the enemy's possession by purchase or otherwise, with the consent of the owner or of his agent, and not by capture or by other forcible and compulsory appropriation.

Communications between high civil and military officers of the so-called Confederate States, preserved in the Confederate Archives Office of the War Department of the United States, or duly certified copies thereof from that office, are competent evidence upon the question whether possession of a steamboat belonging to a citizen of the United States was obtained by the Confederate States by capture or by purchase.

A petition under the act of July 28, 1892, c. 313, for compensation for an interest in a steamboat, which alleges that she was captured by the insurgents and recaptured by the United States during the war of the rebellion, is not sustained by evidence that she was captured by the United States from the Confederate forces after they had obtained possession of her by purchase.

THIS was a petition under the act of Congress of July 28, 1892, c. 313, (copied in the margin,[1]) filed in the Court of

---

[1] An act to confer jurisdiction on the Court of Claims to hear and determine the claim of the heir of Hugh Worthington for his interest in the steamer Eastport.

Whereas it is claimed the steamer Eastport was taken by the United States Anno Domini eighteen hundred and sixty-two, and converted into a gunboat; and

Whereas it is claimed at the time of such taking one Hugh Worthington, then of Metropolis, Massac County, Illinois, but since deceased, was the owner of three fifths interest in said steamer, and no compensation has been paid to said Hugh Worthington or his heirs; and

Whereas his daughter, Mrs. Sarah A. Oakes, of Metropolis, Illinois, claims that Hugh Worthington was a loyal citizen, that she is his only heir at law, and is justly entitled to receive from the United States compensation for the value of her father's interest in said steamer: Therefore

Be it enacted by the Senate and House of Representatives of the United

Claims, January 9, 1895, by Sarah A. Oakes, the heir at
law and next of kin of Hugh Worthington, to recover com-
pensation for his interest in the steamboat Eastport, alleged
in the petition to have been captured by the insurgents,
and recaptured by the United States, during the war of the
rebellion.

The facts of the case, as found by the Court of Claims, were
in substance as follows :

At the outbreak of the war of the rebellion, the steamboat
Eastport, of 570$\frac{34}{55}$ tons burthen, duly enrolled at Paducah,
Kentucky, and commanded by Captain Elijah Wood, was
plying between the ports of Nashville, Tennessee, and New
Orleans, Louisiana, engaged in the cotton trade. After the
beginning of the war, she continued, under Wood's com-
mand, to ply between points on the Ohio River until May,
1861, when, in consequence of the blockade of the Mississippi
River by the United States forces at Cairo, Illinois, she was
tied up at Paducah, and there remained until August, 1861,
undergoing extensive repairs under the orders of Captain
Wood, and of Hugh Worthington, who was the owner of
three fifths of her, the remaining two fifths being owned
by two other persons.

About the last of August, or early in September, 1861, when

States of America in Congress assembled, That full jurisdiction is hereby
conferred upon the Court of Claims to hear and determine what are the
just rights in law of the said Sarah A. Oakes, as heir of Hugh Worthing-
ton, deceased, and that from any judgment so entered by said Court of
Claims either party may appeal to the Supreme Court of the United States,
for compensation for the value of said Worthington's interest in said
steamer Eastport. That upon proper petition being presented by said
Sarah A. Oakes, her heirs, executors or administrators, to said court,
said court is authorized and directed to inquire into the merits of said
claim, and if on a full hearing the court shall find that said claim is just,
the court shall enter judgment in favor of the claimant and against the
United States for whatever sum shall be found to be due.

SEC. 2. That in case judgment shall be rendered against the United
States, the Secretary of the Treasury shall be, and he is hereby, authorized
and directed to pay the claimant, her heirs, executors or administrators,
whatever sum shall be adjudged by the court to be due out of any money
in the Treasury not otherwise appropriated.   27 Stat. 320.

the United States forces were about to take possession of Paducah, and while the Eastport was in the possession and under the control of Captain Wood, he took her, with a small crew, without Worthington's knowledge or consent, from Paducah up the Tennessee River to a place near the mouth of the Sandy River, a few miles above Fort Henry, within the lines of the Confederate forces. Captain Wood returned to Paducah a few months afterwards, and continued to reside there until his death, about the close of the war. What disposition he made of the Eastport does not appear, although papers in the Confederate Archives Office show what is stated in the certificate copied in the margin.[1] Nor does it appear whether the sum of money stated therein was paid to Captain Wood, nor whether he ever rendered an account thereof to the other owners, nor whether they received any part of that sum, nor where they are, nor what has become of their interests in the Eastport, nor why they are not seeking payment for the value thereof.

Some time between September, 1861, and February, 7, 1862,

---

[1] Under date of October 31, 1861, General L. Polk, C. S. Army, telegraphed from Columbus, Kentucky, to the Secretary of the Navy, C. S., that "the price of the steamer Eastport is $12,000;" and on the same date J. P. Benjamin, acting Secretary of War, C. S., telegraphed to General L. Polk directions to "buy the steamer Eastport if thought worth $12,000 demanded."

Under date of November 28, 1861, General L. Polk, in a letter from Columbus, Kentucky, addressed to General A. S. Johnston, C. S. A., stated that he bought the steamer Eastport by authority of the Secretary of the Navy.

Under date of January 5, 1862, General L. Polk wrote to J. P. Benjamin, Secretary of War, C. S., as follows: "By virtue of the authority from the War Department of October 31, I bought the steamer Eastport, and she is now undergoing the necessary alterations to convert her into a gunboat."

Under date of January 16, 1862, J. P. Benjamin, Secretary of War, C. S., wrote to General L. Polk as follows: "I shall order the necessary funds forwarded at once for the Eastport."

Under date of February 2, 1863, General Polk, in a statement to the C. S. Secretary of War of the disbursement of certain moneys, gives as one item, "Am't expended in purchase of steamer Eastport as per receipt of Major Peters, A. Q. M., $9688.92."

No further information on the subject of the within inquiry has been found in said archives.

By authority of the Secretary of War: F. C. AINSWORTH,
Colonel U. S. Army, Chief of Office.

the Eastport was in the possession of the Confederate forces, but whether by reason of capture, or of purchase from Captain Wood, does not appear; and before the latter date she was taken by those forces to Cerro Gordo, Tennessee, and work was there begun to transform her into a gunboat for use in the Confederate service.

On February 7, 1862, while she was lying under the bank of the Tennessee River near Cerro Gordo, and being converted into a gunboat for use in the Confederate service, with the iron and other materials therefor on board, and having been dismantled, and her upper works, cabin and pilot-house cut away, but before she had been completed, or had been used, or was in condition for use, in any hostile demonstration against the United States, she was boarded under the fire of the enemy (whether that fire was from the vessel or from the land does not appear) and captured by detachments of men in small boats from three United States gunboats, commanded by a lieutenant in the Navy, and part of the naval forces on the western waters, then under the control of the War Department, and commanded by Captain Andrew H. Foote, who was serving under a commission from the President of August 5, 1861, appointing him a captain in the Navy, and under an order from the Secretary of the Navy of August 30, 1861, directing him "to take command of the naval operations upon the western waters, now organizing under the direction of the War Department," and to proceed at once to St. Louis, to place himself in communication with Major General Fremont, commanding the army of the West, and to coöperate fully and freely with him as to his own movements, and to make requisitions upon the War Department through him. Immediately after the capture, Captain Foote reported his operations, together with the report of the lieutenant commanding the gunboats, to the Secretary of the Navy, who communicated them to Congress. At the time of the capture, no land forces were near the scene thereof, or took any active part therein.

The Eastport was brought by her captors to Mound City, Illinois, on the Ohio River, arriving there about February 26, 1862; and was there, on the recommendation of Captain

Foote, converted by the United States into a gunboat; and about August, 1862, went into commission as such with a full complement of officers and men of the navy; and continued in the service as part of the Mississippi squadron until April, 1864, when she was sunk by running upon a torpedo, and was blown up by her commander to prevent her capture by the Confederate forces.  The Eastport and all other vessels of the Navy performing services on the western waters were under the control of the War Department until October 1, 1862, when they were turned over to the Navy Department, pursuant to the act of Congress of July 16, 1862, c. 185.  12 Stat. 587.

On July 17, 1862, in the District Court of the United States for the Southern District of Illinois, the district attorney of the United States filed a libel in admiralty against the Eastport, alleging "that on or about the 20th day of June, A.D. 1862, in the Mississippi River near Columbus, Kentucky, there was seized by George D. Wise, captain and assistant quartermaster, with gunboat flotilla, (and which he hereby reports for condemnation) the steamer Eastport, and which was brought into said district.  Said seizure was made for the reason that said steamer was used by and with the knowledge and consent of the owner in aiding the present rebellion against the United States, contrary to the act of August 6, 1861.  The said attorney therefore asks that process of attachment may issue against said steamer, and the monition of this honorable court, and that all persons having an interest in the same may be made parties herein, and that on a final hearing of this case your honor will adjudge and decree condemnation of said boat and order that the same may be sold."  Thereupon the court issued a monition, reciting that the libel had been filed by the district attorney and Captain Wise; and commanding the marshal to attach the Eastport and detain her in his custody until the further order of the court; and to give notice, by publication in a certain newspaper published at Springfield in that district for fourteen days before the day of trial, "and by notice posted up in the most public manner for the space of fourteen days at or near the place of trial, of such seizure and libel, to all persons claiming the said steamer

Eastport, boats, tackle, apparel and furniture, or knowing or having anything to say why this court should not pronounce against the same, according to the prayer of the said libel," to appear before the court at Springfield on September 2, 1862. The marshal's return on the monition stated that by virtue thereof he had "attached the within named boat, and made proclamation of the same;" and notice was published as ordered. And on that day the court entered a decree, reciting the attachment and notice, and that, notwithstanding proclamation made, no one had appeared or interposed a claim; and adjudging "that the default of all persons be, and the same are, accordingly hereby entered, and that the allegations of the libel in this cause be taken as true against said property, and that the same be condemned as forfeited to the United States," and be sold by the marshal. Pursuant to that decree the Eastport was sold October 4, 1862, by the marshal to the United States for the sum of $10,000, which, after deducting allowances to the clerk, to the marshal and to the district attorney, was ordered by the court to be "equally divided between the United States and George D. Wise, the informer herein."

Of those proceedings, Hugh Worthington had no notice or knowledge until after the sale of the vessel under them; but whether her other owners or Captain Wood had any does not appear.

Before and throughout the war, Worthington was a citizen and resident of Metropolis, Illinois, about ten miles above Paducah, and was loyal to the United States, and gave no aid or comfort to the rebellion. He died in March, 1876, intestate and without property, and having received no compensation from the United States for the use or value of the Eastport. The claimant, Sarah A. Oakes, is his daughter, and his sole surviving heir at law and next of kin.

When Captain Wood ran the Eastport up the Tennessee River, she was worth $40,000. When she was captured by the United States forces, she was worth $30,000. During the time she was used by the United States, a fair and reasonable rental for her was $150 a day.

The Court of Claims decided that the claimant was not entitled to recover against the United States, and dismissed the petition. 30 C. Cl. 378. The claimant appealed to this court.

*Mr. John C. Fay* for appellant.

*Mr. Assistant Attorney General Pradt* for appellees. *Mr. Assistant Attorney John G. Capens* was on his brief.

MR. JUSTICE GRAY, after stating the case as above, delivered the opinion of the court.

The special act of Congress of July 28, 1892, c. 313, under which the petition in this case was filed, confers jurisdiction upon the Court of Claims " to hear and determine what are the just rights in law " of the claimant, as the daughter and heir at law of Hugh Worthington, to compensation for the value of his interest in the steamboat Eastport, alleged to have been taken by the United States in 1862, and converted into a gunboat; and authorizes and directs that court, upon her petition, " to inquire into the merits of said claim, and if on a full hearing the court shall find that said claim is just," to render judgment in her favor and against the United States for whatever sum shall be found due. 27 Stat. 320.

Under this act, the question whether "said claim is just " is the same as the question " what are the just rights in law " of the claimant as Worthington's daughter and heir ; and this necessarily depends upon the question what had been his legal right to compensation from the United States for the value of his interest in the vessel.

The act neither recognizes the claim as a valid one, nor undertakes to pass upon its validity ; but simply empowers the Court of Claims to hear and determine whether the claim is valid or invalid ; and the determination of that issue embraces not only the questions whether the claimant was the daughter and heir at law of Worthington, whether he was a loyal citizen of the United States, whether he was the

owner of three fifths of the Eastport, and whether the vessel was taken and applied to the use of the United States, but all other questions, of law or of fact, affecting the merits of the claim. *United States* v. *Cumming*, 130 U. S. 452.

The leading facts of the case, as found by the Court of Claims, are as follows: Worthington was a loyal citizen of the United States, residing at Metropolis in the State of Illinois; and the claimant was his daughter and only heir at law. Early in the war of the rebellion, in consequence of the blockade of the Mississippi River by the forces of the United States, the Eastport was tied up at Paducah in the State of Kentucky, her home port, undergoing extensive repairs under the orders of her master, Captain Wood, and of Worthington, who owned three fifths of her. She was afterwards taken by Wood, without Worthington's knowledge or consent, up the Tennessee River within the lines of the Confederate forces, and came into their possession ; and while in their possession, and being transformed into a gunboat for use in the Confederate service, having on board the iron and other materials therefor, and having been dismantled, and her upper works, cabin and pilot-house cut away, but before she had been completed or used, or was in condition for use, in any hostile demonstration against the United States, she was captured by part of the naval forces of the United States on the western waters, then under the control of the War Department. No land forces took part in the capture, or were in the neighborhood at the time. The Eastport was immediately brought by her captors to Mound City, Illinois, and was afterwards converted by the United States into a gunboat, and put in commission in the Navy as such.

The questions of law presented by the record are not free from difficulty.

By the law of nations, as recognized and administered in this country, when movable property in the hands of the enemy, used, or intended to be used, for hostile purposes, is captured by land forces, the title passes to the captors as soon as they have reduced the property to firm possession ; but when such property is captured by naval forces, a judicial

decree of condemnation is usually necessary to complete the title of the captors. 1 Kent. Com. 102, 110; Halleck's International Law, c. 19, § 7; c. 30, § 4; *Kirk* v. *Lynd*, 106 U. S. 315, 317.

The Eastport, at the time of her capture by the forces of the United States, was in the hands of the Confederate forces, and was being transformed into a gunboat for use in the Confederate service, with the iron and other materials therefor on board. Although not yet in condition for hostile use, she was clearly intended for that use. Consequently if, as 'the Court of Claims held, her capture was made by the Army of the United States, it cannot be doubted that the capture was at once complete upon her being taken into the possession of the national forces, and brought by them to Mound City, Illinois, in February, 1862.

The grounds on which the decision of the Court of Claims proceeded were that by the Army Appropriation Act of July 17, 1861, 12 Stat. 263, there was appropriated for "gunboats on the western rivers, one million dollars;" that, at the time of the capture of the Eastport, the gunboats and the naval forces of the United States on those rivers were under the control of the War Department; that she was on inland waters, and could not be regarded as maritime prize; that she was lying dismantled by the bank of a river, where the seizure might as well have been made by a detachment from the Army, as by one from the Navy; and that, in view of these facts, the Eastport must be considered as having been captured by the Army.

In support of that conclusion, reference was made to *United States* v. 269½ *Bales of Cotton*, Woolworth, 236. But that case was wholly different from the case at bar. In that case, a battalion of cavalry, commanded by an officer of the Army of the United States, went in vessels in the service of the United States up the Mississippi River, and landed in the State of Mississippi, and penetrated into country in the control of the Confederate forces, and, after a conflict with them, took from their possession a quantity of cotton, and brought it by the river to the State of Arkansas; and Mr. Justice

Miller, Acting in the Circuit Court, held that the cotton so captured was not within the jurisdiction of a prize court. The grounds of his decision are sufficiently shown by the following extract from his opinion:

"It is not supposed or alleged that any of these vessels were officered by government officers. They were not even armed vessels, and could not take part in any action, or contribute in any manner by belligerent force to the capture. It is not shown that they remained after they landed the forces; and the fair inference is that they did not. It is averred that the cotton was conveyed by the soldiers to the river, and that it was taken thence to the State of Arkansas; but it is not alleged that it was so taken by the vessels. In short, the entire statement is consistent with the fact that the vessels and crews were in the employment of the War Department, and were used merely as transports to carry the troops; and it is consistent with no other supposition. It is also evident that the capture was not made on the banks of the river, but some distance inland, where the vessels could render no other assistance than to land the forces, and receive them again. I cannot conceive that the employment by the Government of unarmed steamboats, for the mere purpose of transporting troops from one point to another on the Mississippi River, can render every capture made by the troops or detachments so transported prize of war, and let in the crews and officers of those vessels to a share of the prize money. Such vessels are in no sense war vessels, and are neither expected nor fitted to take part in engagements." Woolworth, 256, 257.

In the case at bar, on the other hand, it appears, by the facts found by the Court of Claims, that the Eastport, while waterborne, was boarded and taken by detachments of men in small boats from three United States gunboats, armed vessels, commanded by a lieutenant in the Navy, and part of the naval forces on the western waters, commanded by a captain in the Navy, who reported the capture to the Secretary of the Navy; and that, at the time of the capture, no land forces were near the scene thereof, or took any active part therein. Under these circumstances, we are not pre-

pared to hold that the capture was made by the Army, and not by the naval forces of the United States, although the latter, at the time and place, were under the general control of the War Department.

If it was not a capture by the Army, it was clearly a capture by the naval forces; and the United States rely upon the proceedings for the condemnation and sale of the Eastport in the District Court of the United States for the Southern District of Illinois, which are stated in the record.

Those proceedings, as appears on the face of the libel, were instituted under the act of Congress of August 6, 1861, c. 60, the material provisions of which are as follows:

Section 1 enacts that, if the owner of any property, of whatsoever kind or description, "shall purchase or acquire, sell or give," with "intent to use or employ the same, or suffer the same to be used or employed," or "shall knowingly use or employ, or consent to the use and employment of the same," in aiding, abetting or promoting the then existing insurrection, "all such property is hereby declared to be lawful subject of prize and capture, wherever found; and it shall be the duty of the President of the United States to cause the same to be seized, confiscated and condemned."

Section 2 gives jurisdiction of the proceedings for condemnation of such property to "the District or Circuit Court of the United States having jurisdiction of the amount, or in admiralty, in any district in which the same may be seized, or into which they may be taken and proceedings first instituted."

Section 3 provides that "the Attorney General, or any district attorney of the United States [in the district] in which said property may at the time be, may institute the proceedings of condemnation, and in such case they shall be wholly for the benefit of the United States; or any person may file an information with such attorney, in which case the proceedings shall be for the use of such informer and the United States in equal parts." 12 Stat. 319.

In the proceedings for the condemnation of the Eastport, the libel alleged that she had been seized, in June, 1862, by

an assistant quartermaster, " with gunboat flotilla," and that " said seizure was made for the reason that said steamer was used by and with the knowledge and consent of the owner in aiding the present rebellion against the United States, contrary to the act of August 6, 1861." This is a sufficient allegation that she was so used with the knowledge and consent of her owner, as well as that she was seized for that reason, and brings the case within the first section of that act. The proceedings were in conformity with the practice in admiralty, and were not governed by the strict rules that prevail in regard to indictments or criminal informations at common law. *Union Ins. Co.* v. *United States*, 6 Wall. 759, 763 ; *Confiscation cases*, 20 Wall. 92, 104–107.

The libel was filed, as required by the second and third sections of that act, by the district attorney of the United States, in the District Court of the United States, in a district into which the Eastport had been brought. The libel seems to have been filed by the district attorney on the information of the assistant quartermaster ; but this was unimportant for any purpose, except for the distribution of the proceeds of the sale after condemnation.

The expressions in the opinions in *The Confiscation cases*, 20 Wall. 92, 109, and in *United States* v. *Winchester*, 99 U. S. 372, 376, cited by the appellant as tending to show that the proceedings for condemnation were void, for want of a preliminary order of the President of the United States directing the seizure of the Eastport and the institution of the proceedings, were delivered in cases in which proceedings for the confiscation of land, or of cotton captured on land, were sought to be maintained under the act of July 17, 1862, c. 195, (12 Stat. 589,) and are not easily to be reconciled with earlier judgments of this court under the same act. See *Pelham* v. *Rose*, 9 Wall. 103 ; *Miller* v. *United States*, 11 Wall. 268.

But the act of 1861 differed materially, in its object, and in its provisions, from the act of 1862. As was observed by Chief Justice Waite, speaking for the court, in *Kirk* v. *Lynd*, 106 U. S. 315, the act of 1861 was passed by Congress in the exercise of its power under the Constitution " to make rules

concerning captures on land and water," and was aimed exclusively at the seizure and confiscation of property used in aid of the rebellion, "not to punish the owner for any crime, but to weaken the insurrection;" but the act of 1862 proceeded upon the entirely different principle of confiscating property, without regard to its use, by way of punishing the owner for being engaged in rebellion and not returning to his allegiance. The act of 1861 did not require (as the act of 1862 did) that proceedings for condemnation of the property in question should be instituted "after the same shall have been seized;" and the act of 1861 expressly authorized (as the act of 1862 did not) such proceedings to be instituted by "the Attorney General or any district attorney of the United States [in the district] in which said property may at the time be." The case at bar presents no question of the construction of the act of 1862.

The Eastport having been captured by the United States forces, and taken into the firm possession of the United States, before the institution of the proceedings for condemnation; those proceedings having been instituted by the district attorney, under the authority expressly given him by the act of 1861, in a proper court of the United States in a district into which she had been taken; and thereupon, according to the usual course of proceedings *in rem* in admiralty, the vessel having been taken into the custody of the marshal under a writ of attachment from the court, and notice published to all persons interested to appear and show cause against her condemnation, and no one having appeared or interposed a claim at the time and place appointed for the hearing; we find it difficult to resist the conclusion that the decree of condemnation thereupon entered was valid, as against her former owners and all other persons, under the act of 1861; that the proceedings cannot be collaterally impeached; and that the sale under that decree passed an absolute title to the United States.

But, apart from the question whether the record shows a complete title in the Eastport to have vested in the United States, the claimant has wholly failed to show that Worth-

ington had any legal right to compensation from the United States for his interest in the vessel.

The counsel for the claimant contends that, the capture having been made on navigable waters by vessels of the United States, the claimant is entitled to compensation for the value of Worthington's interest in the Eastport, under the act of Congress of March 3, 1800, c. 14, § 1, which was as follows:

"When any vessel other than a vessel of war or privateer, or when any goods, which shall hereafter be taken as prize by any vessel acting under authority from the Government of the United States, shall appear to have before belonged to any person or persons resident within or under the protection of the United States, and to have been taken by an enemy of the United States, or under authority, or pretence of authority, from any prince, government or State against which the United States have authorized, or shall authorize, defence or reprisals, such vessel or goods not having been condemned as prize by competent authority before the recapture thereof, the same shall be restored to the former owner or owners thereof, he or they paying, for and in lieu of salvage, if retaken by a public vessel of the United States, one eighth part, and if retaken by a private vessel of the United States, one sixth part, of the true value of the vessel or goods so to be restored, allowing and excepting all imposts and public duties to which the same may be liable. And if the vessel so retaken shall appear to have been set forth and armed as a vessel of war, before such capture or afterwards, and before the retaking thereof as aforesaid, the former owner or owners, on the restoration thereof, shall be adjudged to pay, for and in lieu of salvage, one moiety of the true value of such vessel of war as privateer." 2 Stat. 16.

That act was a regulation of the *jus postliminii*, by which things taken by the enemy were restored to their former owner upon coming again under the power of the nation of which he was a citizen or subject. The *jus postliminii*, derived from the Roman law, and regulated in modern times by statute or treaty, or by the usage of civilized nations, has been

rested by eminent jurists upon the duty of the sovereign to protect his citizens and subjects and their property against warlike or ˏviolent acts of the enemy. Vattel's Law of Nations, lib. 3, c. 14, § 204; Halleck's International Law, c. 35,. §§ 1, 2. He is under no such obligation to protect them against unwise bargains, or against sales made for inadequate consideration, or by an agent or custodian in excess of his real authority. The *jus postliminii* attaches to property taken by the enemy with the strong hand against the will of its owner or custodian, and not to property obtained by the enemy by negotiation or purchase.

The act of 1800 is entitled "An act providing for salvage in cases of recapture," and applies only to recaptures from an enemy. In order to come within its purpose, ˏand its very words, the property in question must "have been taken by an enemy of the United States," and "retaken" by a public or private vessel of the United States. Where there has been no capture, there can be no recapture. That enactment has been substantially embodied in later statutes. Act of June 30, 1864, c. 174, § 29; 13 Stat. 314; Rev. Stat. § 4652. The similar provision of the English Prize Acts was held by Sir William Scott to be inapplicable to a British ship captured from the French during a war between the two countries which before the war had been seized, condemned and sold under the revenue laws of France, although the French seizure was alleged to have been violent and unjust. *The Jeune Voyageur,* 5 C. Rob. 1. Neither the English statutes nor our own have ever been held to apply to property which had come into the enemy's possession, by purchase or otherwise, with the consent of the owner or of his agent.

In the present case, the only facts found by the Court of Claims (other than may be ascertained from the papers in the Confederate Archives Office) which can be supposed to have any bearing on the question whether the Eastport came into the possession of the Confederate forces by capture, or by purchase, are these: Before and throughout the war of the rebellion, Worthington, being the owner of three fifths of the Eastport, was a citizen and resident of Illinois, was loyal to

the United States, and gave no aid or comfort to the rebellion, and neither knew of, nor consented to, the Eastport being taken by her captain, Wood, within the lines of the Confederate forces. This precludes any inference that Worthington himself participated in, or consented to, a transfer of the Eastport to the Confederate authorities; but it does not negative the supposition that she was sold to those authorities by Wood, or by the owners of the other two fifths of her. That Wood's possession and control of her was by Worthington's authority and consent is evident from the facts that Worthington owned more than one half of her, and that she was being extensively repaired, under the orders of both Wood and Worthington, shortly before Wood took her within the Confederate lines. At that time she was an unarmed vessel, and fit for commercial purposes only.

It is stated in the finding of facts that it did not appear what disposition Wood made of the Eastport, nor whether he was paid purchase money for her, nor whether he ever accounted for such money to the other owners, nor whether they had received any part of it, nor whether she came into the possession of the Confederate forces by capture, or by purchase from Wood.

If the matter rested here, there would be nothing to warrant the court in concluding that the Eastport came into the possession of the Confederate forces by capture or other forcible appropriation. But it does not rest here.

Upon the question whether the so-called Confederate States acquired possession of the Eastport by capture or by purchase, the extracts from the Confederate archives, made part of the facts found by the Court of Claims, appear to this court to have an important bearing, and to be competent, though not conclusive, evidence.

The government of the Confederate States, although in no sense a government *de jure*, and never recognized by the United States as in all respects a government *de facto*, yet was an organized and actual government, maintained by military power, throughout the limits of the States that adhered to it, except in those portions of them protected

from its control by the presence of the armed forces of the United States; and the United States, from motives of humanity and expediency, had conceded to that government some of the rights and obligations of a belligerent. *Prize cases,* 2 Black, 635, 673, 674; *Thorington* v. *Smith,* 8 Wall. 1, 7, 9, 10; *Ford* v. *Surget,* 97 U. S. 594, 604, 605; *The Lilla,* 2 Sprague, 177, and 2 Clifford, 169.

No better evidence of the doings of that organization assuming to act as a government can be found than in papers contemporaneously drawn up by its officers in the performance of their supposed duties to that government.

For the collection and preservation of such papers, a bureau, office or division in the War Department (now known as the Confederate Archives Office) was created by the Executive authority of the United States soon after the close of the war of the rebellion, and has been maintained ever since, and has been recognized by many acts of Congress.

For instance, Congress, beginning in 1872, has made frequent appropriations " to enable the Secretary of War to have the rebel archives examined and copies furnished from time to time for the use of the Government." Acts of May 8, 1872, c. 140, and March 3, 1873, c. 226; 17 Stat. 79, 500; August 15, 1876, c. 287; March 3, 1877, c. 102; 19 Stat. 160, 310; June 19, 1878, c. 329; 20 Stat. 195; June 21, 1879, c. 34; June 15, 1880, c. 225; March 3, 1881, c. 130; 21 Stat. 23, 226, 402. And the appropriations for the War Department in 1882 included one " for travelling expenses in connection with the collection of Confederate records placed by gift or loan at the disposal of the Government." Act of August 5, 1882, c. 389; 22 Stat. 241. Congress has also occasionally made appropriations " to enable the Secretary of the Treasury to have the rebel archives and records of captured property examined, and information furnished therefrom for the use of the Government." Acts of March 3, 1875, c. 130; 18 Stat. 376; March 3, 1879, c. 182; 20 Stat. 384; June 16, 1880, c. 235; 21 Stat. 266. It has once, at least, made an appropriation " for collecting, compiling and arranging the naval records of the war of the rebellion, including Confederate

naval records." Act of July 7, 1884, c. 331; 23 Stat. 185. And it has made appropriations " for the preparation of a general card index of the books, muster rolls, orders and other official papers preserved in the Confederate Archives Office." Acts of May 13, 1892, c. 72, and March 3, 1893, c. 208; 27 Stat. 36, 600.

It would be an anomalous condition of things if records of this kind, collected and preserved by the Government of the United States in a public office at great expense, were wholly inadmissible in a court of justice to show facts of which they afford the most distinct and appropriate evidence, and which, in the nature of things, can hardly be satisfactorily proved in any other manner.

The act of March 3, 1871, c. 116, § 2, provided for the appointment of a board of commissioners, " to receive, examine and consider the justice and validity of such claims as shall be brought before them, of those citizens who remained loyal adherents to the cause and the Government of the United States during the war, for stores or supplies taken or furnished during the rebellion for the use of the Army of the United States in States proclaimed as in insurrection against the United States, including the use and loss of vessels or boats while employed in the military service of the United States." 16 Stat. 524. By the act of April 20, 1871, c. 21, § 1, it was enacted that " all books, records, papers and documents relative to transactions of or with the late so-called government of the Confederate States, or the government of any State lately in insurrection, now in the possession, or which may at any time come into the possession, of the Government of the United States, or of any department thereof, may be resorted to for information by the board of commissioners of claims created by act approved March 3, 1871; and copies thereof, duly certified by the officer having custody of the same, shall be treated with like force and effect as the original." 17 Stat. 6. The latter act thus not only allowed a particular board of commissioners, appointed to pass upon certain claims against the United States for property taken for the use of the Army during the war of the rebellion,

to have access to such archives for information as to transactions of or with the so-called government of the Confederate States; but it declared the records and papers in such archives, or duly certified copies thereof, to be competent evidence of such transactions.

Section 882 of the Revised Statutes, also, reënacting earlier acts of Congress, provides that "copies of any books, records, papers or documents in any of the Executive Departments, authenticated under the seals of such Departments respectively, shall be admitted in evidence equally with the originals thereof." And, by section 1076, the Court of Claims has "power to call upon any of the Departments for any information or papers it may deem necessary;" "but the head of any Department may refuse and omit to comply with any call for information or papers, when, in his opinion, such compliance would be injurious to the public interest."

The certificate of the officer of the United States in charge of the Confederate Archives Office, embodied in the findings of fact, would appear to have been furnished upon a call from the Court of Claims; and it is not open, at this stage of the case, to objection for not being under the seal of the War Department, since that court has found that the papers in that office show the facts stated in that certificate. Those facts consist of official communications, between high civil and military officers of the Confederate States, including a dispatch from one of their generals in Kentucky, October 31, 1861, to the secretary of the navy, that the price of the Eastport was $12,000; a reply of the secretary of war of the same date, giving authority to the general to buy her if thought worth that sum; a letter of January 5, 1862, from the general to the secretary of war, informing him that, by virtue of that authority, he had bought her, and she was being converted into a gunboat; a letter of January 16, 1862, from the secretary of war to the general, saying that he would at once order to be forwarded the necessary funds for the Eastport; and a statement of disbursements, dated February 2, 1863, by the general to the secretary of war, in which one item was a sum of $9688.92, "expended in purchase of Steamer Eastport."

Not going beyond what is required for the purposes of this case, we are of opinion that the originals of these communications, and consequently the certified copies thereof from the Confederate Archives Office, are competent and persuasive evidence that the Confederate authorities did not obtain possession of the Eastport by capture or by other forcible and compulsory appropriation.

The claimant therefore wholly fails to support the allegation of her petition that the Eastport was captured by the insurgents.

*Judgment affirmed.*