WATTS et al. v. UNITED STATES.

(District Court, S. D. New York. May 27, 1903.)

1. COLLISION—AUTHORIZED SUIT AGAINST UNITED STATES—VIOLATION OF RULES BY WAR VESSEL.

Where Congress by a special act has authorized a suit against the United States in a court of admiralty to determine its liability for a collision at sea between a vessel of the navy in time of war and a merchant vessel, such liability must be determined by the admiralty law, and such war vessel cannot be relieved from fault for a violation of the statutory rules of navigation in failing to sound fog signals while navigating in a dense fog at night, on the ground that the omission was by order of her commander, made in the exercise of his discretion, nor in masking her lights in obedience to orders of the commander of the squadron; there being at the time no statutory authority for such order.

2. SAME—EXCESSIVE SPEED IN FOG.

A war vessel, having a full speed of about 18 knots, which was proceeding at night in a dense fog at a regular cruising speed of 6 knots across the track of outgoing and incoming steamers, such speed being too great to enable her to come to a standstill by reversing before she should collide with a vessel which she could see through the fog, was not going at a moderate speed, as required by article 16 of the international navigation rules (Act Aug. 19, 1890, 26 Stat. 326, c. 802 [U. S. Comp. St. 1901, p. 2868]), and was in fault for a resulting collision with a crossing steamer.

3. SAME—VESSELS CROSSING—BURDENED VESSEL.

Being on a southward course, while the steamer with which she came in collision was eastward bound, she had the steamer on her starboard side, and was subject to article 19 (Act Aug. 19, 1890, 26 Stat. 327, c. 802 [U. S. Comp. St. 1901, p. 2870]), which required her to keep out of the way of the steamer, and she was in fault for violating such rule.

4. SAME—CROSSING AHEAD.

She was also in fault for attempting to cross ahead of the steamer, after the latter was seen, in violation of article 22 (Act Aug. 19, 1890, 26 Stat. 327, c. 802 [U. S. Comp. St. 1901, p. 2870]).

5. SAME—LOOKOUTS.

A war vessel, proceeding at sea, in the night and in a dense fog, at a speed of 6 knots, showing no lights and sounding no fog signals, was required to exercise the utmost vigilance, and to maintain lookouts as far forward and as near the water as possible, as well as at a height above the water and aloft; and she was in fault where she had only the lookouts usually maintained in clear weather, being one at each end of the bridge and two further aft—those on the bridge being 94 feet from the stem and 37 feet above the water.

6. ADMIRALTY—SUIT AGAINST UNITED STATES—JURISDICTION BY SPECIAL ACT OF CONGRESS.

A special act of Congress, passed on the recommendation of the Secretary of the Navy, authorized the claim of the owners of a British steamship, sunk by collision with a naval vessel of the United States, for the loss of such steamship and cargo, to be submitted to a district court

---

¶ 2. Collision rules, speed of steamers in fog, see note to The Niagara, 28 C. C. A. 532.

"under and in compliance with the rules of said court sitting as a court of admiralty," and provided that "said court shall have jurisdiction to hear and determine and to render judgment thereupon." *Held*, that the effect of such act was to confer upon the court jurisdiction to render a decree against the United States for the amount of the loss, on a finding that the collision resulted solely from the violation of the navigation laws by the government vessel.

In Admiralty. Suit for collision, brought under special act of Congress.

Wing, Putnam & Burlingham, for libellants.

Henry L. Burnett, U. S. Atty., and Arthur M. King, Asst. U. S. Atty.

ADAMS, District Judge. On the 28th day of May, 1898, about 7:45 o'clock P. M., a collision occurred, in a fog, about 12 miles southerly and easterly from Fire Island Lightship, between the U. S. Cruiser Columbia and the British Steamship Foscolia, a freighter owned by the libellants, which resulted in the total loss of the latter, with all of the cargo on board and the greater part of the stores and of the personal effects of the crew.

Shortly after the disaster, certain proceedings were taken on behalf of the owners of the Foscolia and her master, to perpetuate the testimony of those on board, pursuant to an order of the Circuit Court for this district, dated July 6, 1898, the United States being duly represented therein.

Subsequently, an Act of Congress was adopted, which was approved on the 27th day of May, 1902—32 Stat. 242, c. 887—which provided:

"That the claim of the owners of the British steamship Foscolia, sunk by collision with the United States steamship Columbia on the evening of May twenty-eighth, eighteen hundred and ninety-eight, near Fire Island light-ship, for and on account of the loss of said vessel and cargo, may be submitted to the United States district court for the southern district of New York, under and in compliance with the rules of said court sitting as a court of admiralty; and said court shall have jurisdiction to hear and determine and to render judgment thereupon: Provided, however, That the investigation of said claim shall be made upon the following basis: First, the said court shall find the facts attending the loss of the said steamship Foscolia and her cargo; and, second, if it shall appear that the responsibility therefor rests with the United States steamship Columbia, the court shall then ascertain and determine the amounts which should be paid to the owners, respectively, of the Foscolia and her cargo, in order to reimburse them for the losses so sustained, and shall render a decree accordingly: Provided, further, That the amounts of the losses sustained by the master, officers, and crew of the Foscolia may be included in such decree."

A libel, setting forth the claimed facts, was accordingly filed herein on the 19th day of June, 1902, to recover for the losses, said to amount to $226,889.36. The libel charged fault upon the Columbia in that

"The Columbia was not showing the masthead and sidelights required of a steam vessel, under Article 2; although it was dense fog she was not sounding the fog whistles required by Article 15; she was not going at a moderate speed in fog, as required by Article 16; she was not observing Article 19, in that with crossing courses the Columbia having the Foscolia on her starboard

side did not keep out of the way of the Foscolia; and was required also by Article 22 to avoid crossing ahead of the Foscolia; and further in violation of Article 29 in that the Columbia had not sufficient lookouts in the proper station; also that after sighting the Foscolia the Columbia's starboard helm tended to throw her quarter against the Foscolia, and thereby aggravate the collision; and in other faults which will be shown on the trial of this cause."

The United States duly appeared, by their attorney for this district, and filed an answer on the 9th day of July, 1902, in which it was admitted that a thick fog prevailed at the time and that the Columbia had all her lights extinguished or screened and was sounding no fog signals but denied the other allegations of fault.

No fault was charged upon the Foscolia.

Subsequently some testimony was taken in this action on behalf of the Foscolia, by commission and otherwise and the testimony taken in perpetuam rei memoriam, heretofore alluded to, has been admitted in evidence here. Some testimony taken by the respondents in a Naval Court of Inquiry June 8th and 9th, 1898, has been admitted in evidence here by consent. Additional testimony on the part of the Commander of the Columbia was taken in this action. Certain proposed findings, based upon the testimony, setting forth the principal facts of the collision, were, on the 7th day of January, 1903, agreed upon by the parties as follows:

"1. The Foscolia was a British merchant vessel owned by the libellants, being 260 feet long, about 36 feet beam, 918 tons net. She was drawing 19 feet 3 inches forward and about 20 feet aft. She was loaded with a general cargo of grain, provisions and other food stuffs, to be taken from New York to Bordeaux.

"2. At 2:50 P. M. of Saturday, May 28th, the Foscolia passed Sandy Hook light-vessel, taking a course of E. ½ S. true, and then proceeded at a speed of 7½ knots per hour. Capt. John Evans was in command with a full corps of officers and crew. At about five minutes to seven Capt. Evans took charge of the bridge, remaining on the starboard side, and ordered the regulation lights to be set, which was done at about 7:05 or 7:07. A man on the lookout was stationed forward in the eyes of the ship. The second officer Reginald Thomas, was on the port side of the bridge.

"3. At 7:15 dense fog set in, the speed of the engines was reduced to 3½ knots per hour, the whistle was steadily blown at intervals of a minute and a half, and a careful lookout was maintained by Arthur J. Shaw, an able seaman, forward on the forecastle head, as well as by the captain and second officer on the bridge.

"4. Just before 7:45 the officers on the Foscolia's bridge and the lookout had seen over the denser fog the tops of the funnels of the Columbia bearing about two or three points on their port bow, and heading across the Foscolia's course. The Foscolia's engines were at once backed full speed, and three blasts of her whistle sounded, and just before the collision, as the way was nearly off the Foscolia, her helm was put hardaport for sternboard.

"Before the two vessels had come in contact several persons on the Columbia noticed that the Foscolia's bow was already turning to port.

"5. The Columbia was a triple-screw armed cruiser engaged in patrol duty, being one of Admiral Howell's squadron. Her dimensions are: Length over all, 415 feet; beam, 58 feet, 2¼ inches; mean draft, 22 feet, 6 inches. She is equipped with two masts and has four funnels, the tops of which are 57 feet, 9 inches above her load line. See agreed table of dimensions. At the time of this collision she was in command of Capt. James H. Sands, with a full corps of officers and crew.

"6. The Columbia had left Block Island intending to pass to the southward on her regular cruise towards a point off Five Fathom Bank light-vessel. The Columbia had been proceeding in fog of varying density ever since her departure from the southeastern point of Block Island. After rounding

Montauk Point, she had taken a westerly course in the endeavor to present to approaching vessels, as small a body as she could to a possible collision. At about 6 o'clock the fog had lightened materially, so that vessels could be seen for a considerable distance. The colors of the Columbia, a little after six, had been hoisted to a passing transatlantic steamer, which remained in sight for half an hour.

"7. Early in the evening from 6 o'clock to 6:30 o'clock a lookout had been stationed on the foremast, but for a considerable time before the collision there was no lookout forward on the Columbia, or within 94 feet of her stem. Just prior to the collision the Columbia's navigation was in charge of Ensign Pringle, who was standing on the front of the officers' upper bridge, which is 37 feet 6 inches above the load line, and 73 feet 3 inches abaft the stem or jackstaff. Another person charged with the duty of a lookout was apprentice (of the second class) Charles A. Benedict, who was standing on the starboard side of the officers' bridge at a line crossing the fore and aft dimension of the keel, 94 feet abaft the stem and about 20 feet in the rear of the position of Ensign Pringle. There was no change made in the station or number of the lookouts from where they were usually placed in clear weather. At this time and until the collision there was no perceptible wind, the sea smooth, the fog was very dense, especially low, so that objects could not be seen for more than 100 yards, although higher it was less dense at an altitude of 50 feet above the water.

"The Columbia had the following regular lookouts in position, (1) starboard end of the bridge, (2) port end of the bridge, (3) starboard side of the upper deck aft, (4) port side of the upper deck aft. In addition to the senior and junior officers of the watch there was a man at the con, and a number of men on the forecastle as well as on the quarter-deck to see if anything could be seen from that position, that could not be seen from above, but they were not regular lookouts.

"Regarding the lookout's position, the witness Benedict testified:

" 'Q. What do you say as to the position of the lookout on the starboard side of the bridge being advantageous or not for seeing vessels? A. No, sir; I don't think you could see as good as you could from the deck.

" 'Q. Not quite as well as from the deck? A. No, sir.

" 'Q. Could you see vessels abeam as easily? A. Well, I don't know. I think I could see just as well; not much difference.'

"Testimony of Seaman John Nicholas Pruser, as to lookouts:

" 'Q. 35. As the man at the wheel was it your duty to keep a lookout ahead to a certain extent to see that you were not running into something? A. Well, we did, sir; aboard; I believe it is a part of my duty if we happen to see anything to report it.

" 'Q. 36. In thick, foggy weather would you be on the lookout for colliding with other vessels? A. Well, we generally did; yes, sir; if we are standing at the wheel, anything we happened to see I suppose we would report, sir.'

"Testimony of Captain James H. Sands as to lookouts:

" 'Q. 12. Your lookouts were on the bridge? A. On each end of the bridge; yes.

" 'Q. 13. Is that the customary place where you keep them? A. Customary place; the place where they have been for four years.

" 'Q. 14. State, if you please, whether that is the proper place or the best place that could be found for them on the forward part of the ship? A. It is the only place where, as a rule, they can get a clear sweep from forward aft on the side on which they are supposed to keep the lookout.'

" 'Q. 35. Is it true that your lookouts in fog are placed in the same way as they are in ordinary clear weather to observe vessels? A. They are. The lookouts are regularly stationed at certain specified points. If, in the opinion of the officer of the deck, the fog is low and can be seen over, he is expected when he exercises his discretion in the matter, to send men to the masthead to see if they can see. If we are expecting to make lights or anything of that kind, he looks over the fog. If he thinks the fog can be seen under, the lookout on the forecastle is notified to see if he can discover under the fog. I have myself sent men up aloft or had them sent up by my order, and I have also inquired from the bridge above if anything could be seen below.'

" 'Q. 44. Would it not make quite a difference whether the lookout was 100 feet further forward than if he was at the bridge which, I think, is 100 feet from the stem? A. Not if the vessel was abeam and proportionately if she is forward of the beam or abaft. It depends upon the bearing of the vessel.'

"The forecastle deck was 20 feet above the water and afforded a safe place for the lookouts to stand, especially when cruising in a smooth sea.

"8. The Columbia had a regular cruising speed of about six knots an hour, which had been directed by Captain Sands, and this same rate of speed had been maintained all day without regard to changes in the fog or the nearer approach of the Columbia to the steamer track of vessels bound eastward and westward along the course to the south of the Fire Island light-vessel.

"The two wing propellers of the Columbia were revolving at a speed of about 36 revolutions, and her third propeller was turning over in vacuum.

"9. At about 7 P. M. the course of the Columbia had been changed to S. W. ¼ S. magnetic in order to cross the track of eastbound vessels and head towards Five Fathom Bank lightship. The Columbia was showing no lights (neither side-lights nor at the masthead), and all her port lights had been carefully screened. She had been sounding no fog signals since the fog had set in.

"10. Quartermaster Bowman was at the con, standing on the port side of the steering wheel, on the upper deck. He was relieved from that duty soon after the collision. Shortly before the collision, and while still at the con, Bowman had heard the sound of distant steam whistles which he supposed were from the Fire Island Light Vessel. The Columbia, however, had not come within the sound range of the Fire Island Light Vessel at that time.

"11. Three lads—an ordinary seaman and two apprentices—Anderson, 19 years old; Field (apprentice, second class), 18 years of age; and Seidt (apprentice, third class), aged 18 years, had obtained permission to practice casting the lead forward. They were taking turns at heaving the lead from the starboard chains—a forward sponson located 58 feet and 9 inches abaft the stem. They were not under any duty to keep a lookout or required to listen for sound signals.

"12. When apprentice Field was thus casting the lead, and apprentice Anderson was about to hand the lead-line to Field, Anderson saw the indistinct outline of the Foscolia in the fog, at about seventy-five yards off. He asked Field what the object was, and Field then looked up and sang out 'sail ho', which was the first report of the Foscolia's approach by any one on the Columbia.

"Ensign Pringle, on the bridge, and lookout Benedict, at the starboard side of the bridge, also at a moment later, sighted the Foscolia on the starboard bow.

"13. On board the Columbia the steam whistle was sounded twice, the helm put to starboard, and the engine-room rung up to go ahead full speed on all three engines. The commanding officer of the Columbia, coming from the emergency cabin, repeated the order for full speed ahead and then sounded the siren to close the bulkheads, but the collision occurred at about the same moment. Then the helm of the Columbia was put hardaport, as it was seen the collision was inevitable.

"14. The Foscolia first grazed along the Columbia's quarter for about 30 feet, and then struck the Columbia at the aft sponson on the starboard side. Both vessels were seriously damaged, the Columbia's side being cut in above the protective deck and the Foscolia's bow torn away aft of her stem to the starboard davit, a distance of 30 or 40 feet. Measures were promptly taken on both vessels, by lowering boats, but in spite of all efforts at the pumps the Foscolia sank and became, with her cargo and effects, a total loss; her ship's company were all taken on board the Columbia and brought by her to port.

"15. The place of the collision was in latitude 40° 20' north, longitude 73° 1' west, and about twelve miles southerly and easterly from the Fire Island lightship. It was directly in the track of steamers bound to and from New York. The time was 7:45 P. M. by the Foscolia's time, but was about 7:39 by the time of the Columbia.

"16. The Foscolia's fog whistle had been regularly sounded at intervals of a minute and a half until the collision. These signals were unheard on the Columbia unless they were the whistles noticed by Quartermaster Bowman which he supposed came from a Lightship.

"17. The Columbia's commander, Captain Sands, was navigating under Squadron General Order No. 5, dated May 6th, 1898, which directed—

" 'I.—The squadron, when under way, shall have all lights masked, no lights whatever being displayed, except those called for by the codes already in use, or such identification lights as may hereafter be adopted.

" 'II.—Fires shall be tended in such manner as to produce the least possible smoke. It is believed that this result can be fully accomplished under the careful supervision of the engineer by feeding in small quantities, and at regular intervals keeping the fires glowing, etc.

" 'J. A. Howell,

" 'Commodore U. S. Navy. Commanding Northern Patrol Squadron.'

"The following U. S. Navy Regulations were in force at the time of the collision:

"377 (12) In time of war, or when necessary to conceal a ship from an enemy, only such lights shall be used as are deemed advisable by the senior officer present.

"445 (1) He (the captain) shall take special care that the lights required by law, to prevent collisions at sea and in port, are kept in order and burning during the night, unless it is necessary to extinguish them for war purposes or while exercising as though engaged in war.

"18. No orders received by Captain Sands had in terms authorized him not to give the prescribed sound signals in fog. These were omitted by his own order, with the instruction to his officers that they were only to be sounded when necessary to avoid a collision.

"It does not appear whether this practice of navigating in fog without sounding whistles was followed or not by any other vessels of the patrol squadron.

"19. At the time of the collision the United States and the Kingdom of Spain were at war.

"20. The Columbia was doing patrol duty with particular reference to reporting the presence of Spanish war vessels, and she was sounding no fog signal and had her lights extinguished as war measures, in order to conceal her presence and identity from the enemy.

"21. Captain Sands of the Columbia was in receipt of information from headquarters that a Spanish fleet might reach our coast at any point and his orders were to make the earliest findings of any discovery of the fleet, by communicating with the nearest signal station at that point, so as to notify the Department of the presence of the enemy."

The International Regulations for preventing collisions at sea, adopted August 19, 1890—26 Stat. 320, c. 802 [U. S. Comp. St. 1901, p. 2863]—were in force at the time and, inter alia, provided as follows:

"Rules concerning lights, and so forth.

"The word 'visible' in these rules when applied to lights shall mean visible on a dark night with a clear atmosphere. * * *

"Art. 2. A steam-vessel when under way shall carry—(a) On or in front of the foremast, or if a vessel without a foremast, then in the fore part of the vessel, at a height above the hull of not less than twenty feet, and if the breadth of the vessel exceeds twenty feet, then at a height above the hull not less than such breadth, so, however, that the light need not be carried at a greater height above the hull than forty feet, a bright white light, so constructed as to show an unbroken light over an arc of the horizon of twenty points of the compass, so fixed as to throw the light ten points on each side of the vessel, namely, from right ahead to two points abaft the beam on either side, and of such a character as to be visible at a distance of at least five miles."

"Sound signals for fog, and so forth.

"Art. 15. All signals prescribed by this article for vessels under way shall be given:

"1. By 'steam-vessels' on the whistle or siren. * * *

"The words 'prolonged blast' used in this article shall mean a blast of from four to six seconds' duration."

"Speed of ships to be moderate in fog, and so forth.

"Art. 16. Every vessel shall, in a fog, mist, falling snow, or heavy rain-storms, go at a moderate speed, having careful regard to the existing circumstances and conditions."

"Steering and sailing rules.

"Art. 19. When two steam-vessels are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other."

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other."

"No vessel, under any circumstances, to neglect proper precautions.

"Art. 29. Nothing in these rules shall exonerate any vessel or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper look-out, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is to be determined whether the Columbia was in fault under these provisions, upon the facts in the case.

The Government's contentions are, in substance: (1) That the United States and the Kingdom of Spain were at war at the time of the collision; that the extinguishment of the side and masthead lights and the screening of the other lights, and the omission to sound fog signals, were necessary and proper war measures, in view of an expected arrival of a Spanish War Fleet upon our coast and the respondents are not liable in damages by reason of the adoption of such war measures, and (2) That apart from the question of the right of the Government to extinguish and screen the lights and the omission to sound fog signals, the Columbia was not in fault for the collision.

The allegations of fault, which are insisted upon, are:

1. That the Columbia was not showing her masthead and side lights, and although there was a dense fog, she was not sounding her fog whistle.

The Naval Regulations and the order relied upon by the respondents appear in the 17th finding of facts. No regulation or order is produced for the Columbia's omission to sound the fog signals. The officer in charge testified, referring to such fact and the foregoing order,

"Q. How do you explain that; why was there no fog signal being sounded? A. The sounding of signals would have disclosed the presence of the vessel. The object of my orders, this one included, relating to a disclosure of identity was that the enemy should not be aware of the presence of a war vessel, and to have used the fog signal, simply to let other vessels know the presence of the vessel I commanded, would have been directly opposite the sense of the order for concealment, in relation to the lights and in relation to the carrying of the fire so as to show the least possible smoke; the entire instructions being to prevent the knowledge of the vessel's presence being known by a possible enemy.

"Q. Then, although not specifically stated in this order that you should omit to sound a fog signal, you interpreted the spirit of those orders to be such as to warrant the omission of the fog signal? A. Certainly, yes, sir.

"Q. You testified before the Naval Court of Inquiry, as follows: 'My interpretation of the actual necessity of the orders is as if they had been issued positively by my superior officer.' In other words, did you by giving that

answer mean that you believed it to be your duty to exercise every possible precaution to prevent the presence of the 'Columbia' being known? A. I knew it to be my duty, from the service to which I was detailed."

I have been referred to no authority sustaining the claim that the exercise of the discretion of the commanding officer of a war vessel in time of war, suffices to relieve the Nation owning the vessel from the result of a violation of the provisions of the statutory law, where the Nation has authorized a suit against itself in a court whose duty it is to apply the law. I must hold that the Columbia was in fault for not sounding the fog signals.

The question whether the Columbia was in fault, under the circumstances, for failing to exhibit the proper lights, is a more difficult one. The order for the masking of the lights was given by competent authority and, if duly authorized by law, was mandatory upon the commander of the Columbia.

The Act of April 23, 1864, 13 Stat. 58, c. 69, embodied in section 4233 of the Revised Statutes [U. S. Comp. St. 1901, p. 2896], provided:

"Rule Fourteen. The exhibition of any light on board of a vessel of war of the United States may be suspended whenever, in the opinion of the Secretary of the Navy, the commander-in-chief of a squadron, or the commander of a vessel acting singly, the special character of the service may require it."

This provision is not found in the Act of Aug. 19, 1890, 26 Stat. 320, c. 802 [U. S. Comp. St. 1901, p. 2863], which went into effect on the 1st of July, 1897. Nor has my attention been called to any similar authority for navigation without the exhibition of lights, in other than inland or harbor waters. By article 30 of the Act of June 7, 1897, 30 Stat. 96, 102, c. 4 [U. S. Comp. St. 1901, pp. 2875, 2884]— 2 Supp. Rev. St. 1892–97, pp. 619, 625—it was provided that the exhibition of lights on a vessel of war might be suspended as in Rule 14 of the Act of April 23, 1864, 13 Stat. 58, c. 69, but this is regarded as a local rule and only applicable to waters distinguished from the high seas. Act of Feb. 19, 1895, 28 Stat. 672, c. 103 [U. S. Comp. St. 1901, p. 2924]. I must hold that as no provision of law existed in 1898 authorizing the suppression of lights upon war vessels navigating the high seas, no defence can be found in the Navy Regulations, in the orders given to the Columbia or in the exercise of the commander's discretion.

2. That she was not going at a moderate speed in fog.

It has been stipulated that she was under a regular cruising speed of about six knots an hour, which had been maintained without regard to changes in the density of the fog or her nearer approach to the steamer track of vessels bound eastward and westward along the course to the south of the Fire Island light vessel. Her full speed was about 18 knots.

The well established rule of law governing the speed of steamers in fog, has been clearly expressed by the Supreme Court, in The Nacoochee, 137 U. S. 330, 11 Sup. Ct. 122, 34 L. Ed. 687, where it was said, referring to a colliding steamer in a case where the necessity for caution was certainly not greater than here (137 U. S. 339, 11 Sup. Ct. 125, 34 L. Ed. 687):

"She was bound, therefore, to observe unusual caution, and to maintain only such a rate of speed as would enable her to come to a standstill, by reversing her engines at full speed, before she should collide with a vessel which she should see through the fog."

It appears that the Foscolia was not seen by any one on the Columbia until she was within about 75 yards and it is not contended that she could have come to a standstill before the collision. It would seem that she recognized the impossibility of avoiding the collision in that way and put her engines full speed ahead in the hope of passing the Foscolia before the latter reached her, but without success, and she was in fault.

3. That having the Foscolia upon her starboard side, she did not keep out of the way of the Foscolia.

From the position of the Columbia, when she changed her course, about 7 o'clock P. M. to about Southwest ¼ South magnetic, to head across the course of east-bound vessels, she was bringing them upon her starboard side, subjecting herself to the provisions of article 19, and was bound to avoid the Foscolia, so approaching, which she did not do and was in fault.

4. That she was required to avoid crossing ahead of the Foscolia.

This is involved in the immediately preceding allegation of fault. The Columbia's duty under article 22 (Act Aug. 18, 1890, 26 Stat. 327, c. 802 [U. S. Comp. St. 1901, p. 2870]), was unmistakable, nevertheless she proceeded directly across the course of the Foscolia, upon the theory that it was the best course under the circumstances. She did not succeed, however, in avoiding the disastrous results of a severe collision and was in fault.

5. That she had not sufficient lookouts in the proper stations.

It is contended by the respondents that the libellants' allegation of fault in this respect can not be sustained, as the Columbia had a competent lookout stationed at each end of her bridge and two stationed further aft, and that there were other persons, not charged with the duty of lookouts, on the bridge and forward, who could see and hear so far as the fog permitted, any approaching vessels. But the Columbia's duty to maintain lookouts was not fulfilled under the circumstances. The lookouts were the same as usually maintained in clear weather. The dense fog and the absence of any signals on her own part, required the utmost vigilance and it was incumbent upon the Columbia to maintain lookouts as far forward and as near the water as possible and at a height above the water, as well for the purpose of hearing as seeing. The part of the bridge upon which the lookouts were stationed was 94 feet from the stem and 37 feet 6 inches above the water. The vessels were approaching each other at an angle of 12 to 15 degrees, and no excuse can be found for a failure to have lookouts forward, and there was no reason why they should not have been stationed at the stem, which besides being so much nearer any approaching object, was about 15 feet closer to the water. The necessity of having a lookout aloft also, under the circumstances, was obvious. One of the lookouts on the bridge had been called down from a position on the foremast, where he had been doing lookout duty, and was not replaced, although the fog was becoming more

dense and the necessity for the greatest precautions becoming more urgent. The allegation should be sustained. The Java, 14 Blatch. 524, Fed. Cas. No. 7,233; The Michigan, 11 C. C. A. 187, 63 Fed. 280, 288.

6. That the effects of the collision were aggravated by putting the helm to starboard.

The evidence is conflicting upon this contention and it is not necessary to decide it, in view of the other conclusions reached.

The Government contends in this action that the only effect of the Act under which the action was brought, was to open the door of this court to the libellants to ascertain if they had any legal rights to recover for the damages sustained by them and that it was not intended that any legal rights of the Government should be waived, citing Ford v. U. S., 116 U. S. 213, 6 Sup. Ct. 360, 29 L. Ed. 608; U. S. v. Cumming, 130 U. S. 452, 9 Sup. Ct. 583, 32 L. Ed. 1029; Oakes v. U. S., 174 U. S. 778, 19 Sup. Ct. 864, 43 L. Ed. 1169.

Ford v. U. S. was a case where the question of the general jurisdiction of the Court of Claims was involved, and it was held that the claimant could not avoid the obstacle of the statute of limitations by procuring a reference to that court by one branch of Congress.

U. S. v. Cumming was a case where the claimants were manufacturers &c. of whiskey and alcohols and suffered damages in consequence of certain acts of a revenue collector. It was held that the Act of Congress giving jurisdiction to the Court of Claims merely intended that the claimants should be entitled to sue, unembarrassed by a statute of limitations, and to recover such judgment as might be consistent with the settled principles of law, which precluded a judgment against the Government in the case presented, and that the only right which the Government waived was a defence based upon the statute of limitations.

Oakes v. U. S. was a case where it was referred to the Court of Claims to hear and determine what were the just rights in law of the claimant and the determination of the question depended upon his legal right to compensation from the Government.

It seems clear that these cases are not decisive of the one under consideration. Here, the right to sue having been given, the question is whether the Government vessel violated the navigation laws, which are expressly made applicable to "all public and private vessels of the United States upon the high seas" * * *

In the Secretary of the Navy's official communication to Congress, respecting the enactment of a law under which the United States could be sued, it was said:

"A collision with one of our warships having occurred under such circumstances, when, for public reasons deemed sufficient to justify such action, our vessel was disregarding the rules of the road at sea, and a valuable merchant steamer and cargo belonging to a friendly power being destroyed, apparently without contributory negligence on the part of her officers and crew, it would seem proper that the losses incident thereto should not be allowed to rest upon the owners of a private vessel, but that such losses should, on the contrary, be borne by the United States, provided, of course, that it shall be judicially determined in the courts of the United States that the facts are as hereinbefore outlined."

Congress thereafter provided, in substance, that the claim of the libellants arising out of the collision should be submitted to this court, in conformity with rules governing it when sitting as a court of admiralty, and that it should have jurisdiction to hear, determine and render judgment upon the facts and if it should appear that responsibility for the loss rested with the Columbia, to ascertain and determine the amounts which should be paid the libellants and render a decree accordingly. This is in accordance with the practice which has long prevailed in Congress to refer, in proper cases, to the United States Courts for adjudication, claims against the Government, arising out of fault on the part of its vessels. In St. Louis & Miss. Val. Transp. Co. v. U. S., 33 Ct. Cl. 251, 264, the court said:

"Without statutes conferring jurisdiction the courts have no authority to consider cases of wrong arising in maritime collisions caused by Government vessels, inasmuch as the United States are not liable for the torts of their officers or agents except as they consent to be. But Congress have repeatedly recognized the obligation of the Government to compensate for injuries occasioned by the negligence of its agents. The legislative authority has been invoked time and again to give redress in some form or other, and this court has been used as the instrument of Congress in dealing with such cases. Sampson v. United States, 12 Ct. Cl. 480; Jane Carroll et al. v. District of Columbia, 22 Ct. Cl. 104; Joseph Irwin v. United States, 23 Ct. Cl. 154; Walton et al. v. United States, 24 Ct. Cl. 372."

The Columbia having violated the Navigation Rules in the several particulars mentioned, the libellants are entitled to a decree, with an order of reference to ascertain the damages. It is so ordered.