## KIRK *v.* LYND.

Where, pursuant to the act of Aug. 6, 1861, c. 60, entitled "An Act to confiscate property used for insurrectionary purposes," lands were seized and condemned, the purchaser of them under the decree took an estate in fee.

APPEAL from the Circuit Court of the United States for the Eastern District of Louisiana.

Pasteur, the owner in fee of lands in New Orleans, remained in the possession of them until Nov. 17, 1863. A libel of information under the act of Aug. 6, 1861, c. 60, was then filed against them in the proper District Court of the United States. A decree for their condemnation and forfeiture was rendered Dec. 5, 1863, by virtue whereof they were sold, Jan. 13, 1866. Under the purchaser, the defendants, Lynd and Lewis, derive their title.

Pasteur died May 3, 1874. His widow and children then brought this suit for the lands, and for the fruits and revenues derived therefrom since his death.

The defendants demurred to the bill, setting up as the principal ground therefor that by the proceedings in the District Court, including the seizure, libel, decree of condemnation, and the sale thereunder, the fee, and not simply the life-estate of Pasteur, in the forfeited lands passed to the purchaser, and that therefore the complainants were entitled to no relief. The demurrers were sustained and the bill dismissed. The complainants thereupon appealed.

*Mr. R. Stewart Dennee* for the appellants.

*Mr. John A. Campbell* and *Mr. Thomas L. Bayne* for the appellees.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The single question in this case is, whether the purchaser of real property condemned under the act of Aug. 6, 1861, c. 60, entitled "An Act to confiscate property used for insurrectionary purposes," takes a fee, or only an estate for life. The act provides that if during an insurrection against the government of the United States, after the President has declared by proc-

lamation that the laws of the United States are opposed, and
the execution thereof obstructed by combinations too powerful
to be suppressed by the ordinary course of judicial proceedings,
or by the power vested in the marshals by law, any person
shall purchase or acquire, sell or give, any property with intent
to use or employ the same, or suffer the same to be used or
employed, in aiding, abetting, or promoting such insurrection
or resistance to the laws, or any person engaged therein; or if
any person, being the owner of any such property, shall know-
ingly use or employ, or consent to the use or employment of
the same, as aforesaid, all such property shall be lawful subject
of capture and prize wherever found, and the President may
cause the same to be seized, confiscated, and condemned. Pro-
vision is then made for judicial proceedings of condemnation
in the courts of the United States. The seizure and condem-
nation in the present case were because the property had been
used and employed, with the knowledge and consent of the
owner, in aid of the insurrection.

Express authority is vested in Congress by the Constitution
to "make rules concerning captures on land and water."
Art. 1, sect. 8. The statute now in question is manifestly an
exercise of that power. As was said by Mr. Justice Strong, in
*Miller* v. *United States*, 11 Wall. 268, 308: "It imposed no
penalty. It declared nothing unlawful. It was aimed ex-
clusively at the seizure and confiscation of property used to
aid, abet, or promote the rebellion, then a war, or to maintain
the war against the government. It treated the property as
the guilty subject." All private property used, or intended to
be used, in aid of an insurrection, with the knowledge or con-
sent of the owner, is made the lawful subject of capture and
judicial condemnation; and this, not to punish the owner for
any crime, but to weaken the insurrection. The offence for
which the condemnation may be decreed is one that inheres in
the property itself, and grows out of the fact that the property
has become, or is intended to become, with the approval of its
owner, an instrument for the promotion of the ends of the in-
surrection. To justify a judicial sentence of condemnation, the
consent of the owner to the hostile use of his property must
be proven; but if it be proven, condemnation is decreed, not

because the owner has subjected himself to punishment, but because the property has been devoted to the insurrection and must suffer the consequences. The property is the offending thing, and condemnation is decreed because its owner has voluntarily allowed it to become involved in the offence.

In war the capture of property in the hands of the enemy, used, or intended to be used, for hostile purposes, is allowed by all civilized nations, and this whether the ownership be public or private. The title to movable property in hostile use, captured on land, passes to the captor as soon as the capture is complete; that is to say, as soon as the property is reduced to firm possession. The absolute title to immovable public property owned by the enemy does not pass until the war is ended and peace restored. Then, unless provision is made to the contrary by the treaty of peace or otherwise, the ownership is changed if the conquest is complete. In regulating the capture of private property devoted to the use of an insurrection against the authority of the United States, Congress has provided for a judicial inquiry into the facts and a sentence of condemnation before title can pass out of the owner. When the inquiry is had, and the necessary sentence pronounced by the appropriate judicial tribunal, the title passes by reason of the capture or conquest, the lawfulness of which has been established in an adversary proceeding against the property seized under the direction of the President, and subjected to the jurisdiction of the court designated by law for that purpose. The title acquired by the purchaser in this case was of that kind. The property bought had been seized under the authority of the statute as property used in aid of an insurrection against the United States with the consent of its owner. The fact of hostile use with the owner's consent was established, and the requisite sentence of judicial condemnation entered. In this way the title of the United States by capture was perfected. That title, as against the owner and his heirs, was the fee. The defendants below, who are the defendants in error here, have succeeded to that title.

Property captured in war is not taken to punish its owner any more than the life of a soldier slain in battle is taken to punish him. The property as well as the life is taken only as

a means of lessening the warlike strength of the enemy. *Young v. United States,* 97 U. S. 39.

There is here no question of pardon and amnesty as there was in the case of *Armstrong's Foundry,* 6 Wall. 766, where it was held that the pardon of the owner before a sentence of condemnation relieved him from the consequences of his assent to the unlawful use of his property, so far as the United States were concerned, and might to that extent be used as a bar to further proceedings in the condemnation suit. But in that case the pardon was set up as a defence against the condemnation. Here there is nothing of the kind. The court having the property in possession, and proceeding against it, has decreed its condemnation. So long as this decree stands it affords conclusive evidence of a perfected title in the United States by a lawful capture, judicially ascertained and determined. To these proceedings the ancestor of the heirs for whose benefit this suit is prosecuted was in law a party, and both he and they are bound by the adjudication. The judgment is one that cannot be collaterally impeached.

It is true that in the case of *Armstrong's Foundry, supra,* it was said by Mr. Chief Justice Chase, in the opinion, that "the statute regarded the assent of the owner to the employment of his property in aid of the rebellion as an offence, and inflicted forfeiture as a penalty;" but this language must be construed in connection with the facts then under consideration. There the question was whether the pardon could be used as a bar to the pending proceedings for condemnation, and the effect of what was said was no more than to apply to that case the principle afterwards announced by the same learned Chief Justice in *United States* v. *Padelford,* 9 id. 531, 543, and declare that the law made the proof of pardon of the owner a complete substitute for proof that he gave no consent to the use of his property in aid of the rebellion. The guilty consent of the owner to the unlawful use is necessary to make the property a subject of lawful capture, and as the pardon was, under the rule in Padelford's case, equivalent to proof that no such consent was given, the lawfulness of the capture could not be established, and, consequently, as against the United States, there must be a judgment of acquittal.

The act of July 17, 1862, c. 95, proceeds upon an entirely different principle. That was, according to its title, "An Act to suppress insurrection, to punish treason and rebellion, and to seize and confiscate the property of rebels." Its object was, not to authorize the capture of property used to promote an insurrection, but to confiscate the property of traitors. The seizure was to be made, not because the property was in law the offender, but because the owners were engaged in rebellion, and would not return to their allegiance to the United States. The object evidently was, not to make the property a lawful subject of capture and prize, as in the act of 1861, but to punish the owner for countenancing the rebellion. This distinction is recognized in all the cases where the matter has received consideration. The justices who dissented from the judgment in *Miller* v. *United States, supra,* while arguing that the act of 1862 was unconstitutional, impliedly admitted the validity of that of 1861, because it was directed against the property as the offending thing. It was, also, because the act of 1862 was in the nature of a punishment of the owner for his treason, that the explanatory resolution, No. 63, 12 Stat. 627, was passed to meet the objections which had been suggested by the President. In this way the condemnation of real property under the act of 1862 was confined to the natural life of the offending owner; but nothing was done with the act of 1861, because that had reference only to the capture and condemnation of property for its unlawful use.

It follows that the court below was right in holding that the fee passed by the condemnation, and its judgment is consequently

*Affirmed.*