## UNITED STATES v. MAYOR AND COUNCIL OF CITY OF HOBOKEN, N. J., et al.

District Court, D. New Jersey. August 10, 1928.

Walter G. Winne, U. S. Atty., of Hackensack, N. J., Chauncey G. Parker, of Newark, N. J. (Richard F. Jones, of Washington, D. C., of counsel), for the United States Shipping Board.

Horace L. Allen, Corp. Atty., of Hoboken, N. J. (John S. Wise, Jr., of New York City, of counsel), for defendants.

CLARK, District Judge. This is the return of a rule to show cause why a permanent restraining order should not issue. The rule was granted by one of the other judges of this court on ex parte motion. It was accompanied by a temporary restraint granting in full the prayer of the United States that certain property in the city of Hoboken be declared permanently tax-exempt. The facts are not in dispute. The North German Lloyd and the Hamburg-American Line, the two large German steamship companies operating from this country, acquired part of the bed of the North branch of the Hudson river. Such part extended from the high-water mark opposite that part of the shore which was within the municipal limits of the city of Hoboken. We have not been furnished with any connected history of these properties. However, we have supplemented the facts furnished to us with some investigation of our own. The chain of title to land under piers 1, 2, and 3 (North German Lloyd) shows that they were acquired from the riparian commissioners, pursuant to an act of the Legislature passed April 19, 1889 (4 Comp. St. 1910, p. 4393, § 31), conveying to the city of Hoboken the lands under the Hudson river fronting on Hudson Square, a public park in that city. In return for this grant, the city covenanted as follows:

"The said grant and conveyance is made upon the conditions and upon the covenants of the said the mayor and council of the city of Hoboken, its successors and assigns forever, that the said square and the lands under water in front thereof shall be kept and maintained as an open public square forever fronting on the tide water of the Hudson river, and that *no buildings or other structures shall be erected on said public square or on the lands under water, hereby granted, or in front of said square, which shall in any way obstruct or interrupt the view or public access to the water from any part of the said square*, and if at any time said public square or the lands hereby granted, or in front of said square, shall cease to be used as a public square or park, or any of the above covenants shall be broken, the lands under water granted herein and hereby shall revert to the state of New Jersey, and belong to the state the same as if this grant and conveyance had not been made." (Italics ours.)

In 1901 and in 1909 the city leased an easement of docking, et cetera, over, first 100, and then later 50 feet of these lands to the North German Lloyd Dock Company for 999 years. Each of these leases contained this covenant:

"Neither of the parties to this agreement, nor the successors nor assigns of either, shall fill in said lands under water, or erect or *maintain* thereon any buildings or other structures which shall in any way obstruct or interrupt the view or public access to the water from any part of said Hudson Square." (Italics ours.)

Piers 4, 5, and 6 (Hamburg-American

Line) were also obtained from the state. They were granted by special act of the Legislature in 1869, before the creation of the riparian commission, to the United Delaware & Raritan Canal Company (P. L. 1869, c. 386). The date and circumstances of the transfer from this company to the Hamburg-American Line, or its American subsidiary, Hamburg-American Line Terminal & Navigation Company, do not appear. It may be important for the city to examine this transfer to determine if there is any condition similar to that outlined in respect to piers 1, 2, and 3.

On these riparian lands the piers so familiar to commuting citizens of New Jersey were erected. They were in constant use for passenger and freight transportation between this country and Germany until the declaration of war between the two nations on April 6, 1917. On March 28, 1918, Congress passed an act reading as follows:

"The President is authorized to acquire the title to the docks, piers, warehouses, wharves, and terminal equipment and facilities on the Hudson river now owned by the North German Lloyd Dock Company and the Hamburg-American Line Terminal & Navigation Company, two corporations of the state of New Jersey, if he shall deem it necessary for the national security and defense: Provided, that if such property can not be procured by purchase, then the President is authorized and empowered to take over for the United States the immediate possession and title thereof. If any such property shall be taken over as aforesaid, the United States shall make just compensation therefor to be determined by the President. Upon the taking over of said property by the President, as aforesaid, the title to all such property so taken over shall immediately vest in the United States: Provided further, that section three hundred and fifty-five of the Revised Statutes of the United States shall not apply to any expenditures herein or hereafter authorized in connection with the property acquired." 40 Stat. 459.

Three months later, the President by proclamation determined and declared that—

"The acquisition of title to the foregoing docks, piers, warehouses, wharves, and terminal equipment and facilities, is necessary for the national security and defense, and I do hereby take over for the United States of America the immediate possession and title thereof, including all leaseholds, easements, rights of way, riparian rights and other rights, estates and interests therein or appurtenant thereto."

\* \* \* \* \* \* \*

"Just compensation for the property hereby taken over will be hereafter determined and paid." 40 Stat. 1804, 1805.

On December 3, 1918, the President by proclamation further declared:

"Pursuant to the authority vested in me by the said act of Congress, approved March 28, 1918, do hereby determine and declare that the just compensation for the property in and by said proclamation of June 28, 1918, expropriated for the United States of America is the sum of seven million, one hundred and forty-six thousand, five hundred eighty-three dollars ($7,146,-583); and I do hereby order and direct that compensation for the same, aggregating said amount of $7,146,583, be made out of the money appropriated by the act approved December 15, 1917. \* \* \*" 40 Stat. 1914, 1915.

The schedules to this proclamation indicated the disposition of the money would be $2,314,877 to the Hamburg-American Line Terminal & Navigation Company, a corporation of the state of New Jersey, and $1 to the North German Lloyd Dock Company, a corporation of the state of New Jersey, in respect of its reversion, and $4,-784,205 to the Alien Property Custodian on behalf of the North German Lloyd, a corporation of the German Empire, in respect of a 999-year lease held by it from the dock company.

Some time after the close of the war, piers 1, 2, and 3 were leased by the War Department as follows:

| Pier. | Lessee. | Term. | Consideration. |
|---|---|---|---|
| No. 1 | Panama Railroad Co. | 5 years from 12/6/19 | $15,000 a month |
| No. 2 | Cosmopolitan Steamship Co. | —— from 1/8/20 | $15,000 a month |
| No. 3 | Munson Steamship Co. | 5 years from 8/31/20 | $16,725 a month |

Except in the case of the Panama Railroad Company (itself a government corporation), the leases were assigned to the Shipping Board. Each of them contained a clause substantially as follows:

"8. The use of any part of the leased premises by the lessee in handling merchandise in or out of the pier, or otherwise, shall be such as not to interfere in any way with the government's use of said pier, as in this paragraph provided, or with the wa-

ters adjacent thereto, or with any part of said pier, or of the adjacent waters, at any time, with or without notice in advance, notwithstanding the existence of this instrument, and the government's business in connection with said use shall at all times have paramount right of way over the business of the lessee. It is further agreed that any War Department vessels engaged in the return of the American dead from Europe and in the maintenance or return of the American forces in Germany shall be permitted whenever necessary to dock at said pier No. 3, and that in each instance of such use the United States shall refund to the lessee a pro rata or share of the cost to lessee of the pier as a whole (including cost or rental, upkeep, and other expenses), based upon the berthing and/or storage space used and the length of time so used in each instance."

The record again appears to neglect piers 4, 5, and 6, and is silent as to their use subsequent to the war. We gather that they were transferred by the War Department to the Shipping Board, and either used by the United States Shipping Board boats or destroyed by fire. We suggest here also to counsel for the city that further investigation might be useful to enable it or the state to take advantage of such rights as they may have.

Before any discussion of the right, the court is impelled to speak of the remedy. Counsel for the government touch on the question of jurisdiction more by way of assumption than by way of argument, and by citing a case where a similar issue had been considered in equity. Clallam County v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328. Many similar cases could, of course, be adduced. Lincoln County v. Pacific Spruce Corporation (C. C. A.) 26 F. (2d) 435. In none of them, however, does it appear that any appeal was made against the exercise of that discretion on which the concurrent jurisdiction of a court of equity by its very nature rests. A concession of the propriety of the forum in the statutory sense does not necessarily bring about the transformation of that forum into a court of equity. Constantly certainly, and, we hope, patiently and clearly, we find ourselves explaining why we feel we cannot restrain somebody from doing something. Mute evidence, perhaps, of a tendency is found in the failure of either the city or the court issuing the injunction to object to such procedure in this case.

The United States courts adopted, as did the other judicial systems in this country, "the principles and practice of the equity jurisdiction as established in English jurisprudence." Robinson v. Campbell (1818) 3 Wheat. 214, 4 L. Ed. 372; Waterman v. Canal Bank & Trust Co. (1909) 215 U. S. 33, 30 S. Ct. 10, 54 L. Ed. 80. Most of that vast field has been left open to the traditional common-law method of development—the interpretation of courts, rather than of codes. It is significant, then, that one of the plainest and most elementary of the rules governing equity jurisdiction was set forth in the original Judiciary Act, and was section 16 of the Act of September 24, 1789 (28 USCA § 384). Even the most cursory study of the political literature of the time and the debates in Congress on the Judiciary Act explains that significance. The Fathers, or, many of them, were afraid of a central government, and were reluctant to intrust too much power to its courts. Obviously, that great power inherent in the Chancellor must be defined by them, rather than by the judges they feared. So we find them saying (we give it as of to-day, because the only change is the substitution of "in any court" for "in either of the courts"):

"Suits in equity shall not be sustained in any court of the United States in any case where a plain, adequate, and complete remedy may be had at law." Title 28, § 384, USCA.

In our humble opinion, this provision should be made into a wall motto or desk emblem, in the style of the high-powered executive, and placed in the chambers of every federal judge upon his appointment. We say this because, in our view, the present attitude of some of the courts towards this greatest of all their powers has read into the emphatic prohibition of that early Congress—reiterated in the Revision of 1911 (March 3, 1911, 36 Stat. 1163)—a proviso which leads them to base their action on what appears to them to be the *superiority* of the one remedy over the other.

Of course, in the very effectiveness of the relief lies the danger of its abuse on the part of any court. Before the justice of the demand can be determined, often, at all, and, at any rate, by the constitutional means of a jury, the defendant is facing the risk of imprisonment—again without a jury to pass on his action or non-action. It is, we think, because of the realization of such dangers that the Act of October 15, 1914, 38 Stat. 738 (28 USCA § 387, and 29 USCA § 52), was drafted to cover a class of cases (labor injunctions) where a misuse leaves a sense of

injustice against the existing system in the minds of those whose good will is in my opinion essential to its continuance. It may be observed that, since this act has been on the books, the United States judges, in this district at least, have been shunned in favor of their colleagues on the state bench. (For a scholarly review of the legal principles arising upon the use of injunctions in disputes between an employer and employee, we are indebted to the dissenting opinion of Mr. Justice Brandeis, in Truax v. Corrigan, 257 U. S. 312, 354, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375, and the notes appended thereto by the learned Justice.)

In the case of the exercise of this injunctive power by the federal courts, a further and equally serious consequence threatens. That is the ousting of the state from the consideration of the particular matter, either in its judicial or in its administrative departments, or in both. This court reiterates the views expressed three years ago in a water rate case. It might add that it feels that events which have transpired since then have only served to confirm its conviction in that regard. The theory seems to be that, since the question is one that can be carried ultimately to the highest United States court, the United States Supreme Court, it might as well be considered in the first instance by the lowest United States court, the United States District Court. This procedure, first, deprives the United States Supreme Court of the expression of the state court's views on the question, opinions which they always desire and in cases, for instance of interpretation, of statutes, actually follow (Wuchter v. Pizutti, 48 S. Ct. 259, 72 L. Ed. 446); and, second, in our opinion, it has the exceedingly harmful result of undermining the confidence of the people in the federal courts.

It may be and is argued that federal judges are citizens of the same states and learned in the same law as the state judges, and that this feeling of the average citizen towards some of the activities of the federal courts is an unreasoning and as unreasonable as that of our ancestors toward a federal government. Nevertheless it is our humble judgment that any federal judge who has given the matter much thought senses this feeling, and understands that it is a not unnatural result of the preference for local self-government. If such judge, even after consideration, regards this view as fanciful, let him read the Debates in Congress, particularly those preceding and

resulting in the passage of section 266 of the Judicial Code (28 USCA § 380), the provision taking away from a single District Judge the power to restrain the operation of state agencies, and those concerning certain legislation introduced at the present session of Congress. Courts do not exist in a vacuum, but depend, even more, in the last analysis, than the other branches of government, on the thoughtful and continued support of the governed. By the same token, those judges who believe in our federal courts will endeavor to confine their functions to those fields in which that support is ungrudgingly given. In our opinion, the original cause of the trend towards expansion of the injunctive powers lay in the importance of the issues presented in the courts. Whether or not the rates of public utilities could be regulated constitutionally entirely dwarfed the question of whether or not the highest state or lowest federal court should first determine that issue. Granger Cases. To-day the minor problem has become the important and still-unsettled one.

In the same way, we feel that the excessive use of the power to remove cases to the federal courts, now existing under the "diversity of citizenship" provision of the United States statutes, is equally proving detrimental to those courts. The unreality of taking a case away from the state court, on the theory that the court and jury are prejudiced, because they are not citizens of the same state as a corporation which happens to have been incorporated in another state, carries its own condemnation of the existing procedure.

The various positions taken by the United States Supreme Court on this subject are both historical and familiar. See cases cited in the notes to 28 USCA, § 71, and a discussion of the cases of Bank of the United States v. Deveaux, 5 Cranch, 61, 3 L. Ed. 38 (1809), and Louisville, etc., R. R. v. Letson, 2 How. 497, 11 L. Ed. 353 (1844), in Mr. Warren's History of the Supreme Court, vol. 1, p. 389; vol. 2, p. 394; vol. 3, p. 427. Mr. Warren, in an article in 37 Harv. L. Rev. entitled "History of the Federal Judiciary Act of 1789," at page 90, refers to the last-named case as "this malignant decision." Similar views have also been expressed by other writers. See "Congress Should Abrogate Federal Jurisdiction over Corporations" (Alfred Russell), 7 Harv. L. Rev. 16; "Federal Jurisdiction in Cases of Corporations" (Seymour D. Thompson), 29 Am. Law Rev. (1895); "Jurisdiction of Federal Courts in

Actions in Which Corporations are Parties" (Judge Trieber), 39 Am. Law Rev. (1905); "A Legal Fiction with Its Wings Clipped" (Simeon E. Baldwin), 41 Am. Law Rev. (1907); "Jurisdiction of Federal Courts over State Corporations" (P. J. Alitzer), 43 Am. Law Rev. (1909); and, more recently, articles by Professor Frankfurter in 13 Cornell Law Quarterly, p. 499, and by one of his pupils, Mr. Henry J. Friendly, entitled "The Historic Basis of Diversity Jurisdiction," in 41 Harv. Law Rev. p. 483.

A tribute from the antipodes might also be noticed in the opinion of the High Court of Australia in Australasian Temperance and General Mutual Assurance Society, Ltd., v. Howe, 31 C. L. R. 290. That court held that corporations were not residents, within the meaning of article 75 of the Australian Constitution (63 & 64 Vict. c. 12, § 71), the judges speaking as follows:

Higgins, J., at page 330: "If we could consider what is desirable * * * we might think that the jurisdiction given in matters 'between residents of different states' is a piece of pedantic imitation of the Constitution of the United States, and absurd in the circumstances of Australia, with its state courts of high character and impartiality."

Starke, J., at page 339: "As a matter of history, this fear (of local influence prejudicial to nonresidents seeking redress in the local courts), little grounded in point of fact in Australia, led to the passing of the provision in the Australian Constitution."

It seems to this court that the whole question of the diversity of citizenship jurisdiction might profitably be re-examined and revised to accord with facts rather than with history. A beginning might well be made with respect to foreign corporations, where two fictions added together result in transferring the prejudice to the federal courts themselves. The protection against actual local prejudice can be specifically reserved in any statute modifying the present rule. Those interests that seem to oppose any change, on the ground that the juries in certain states or counties are not all they should be, would do better to devote their efforts to improving the conditions they complain of, rather than to forcing the federal courts to retain an unreasonable jurisdiction, and so risk losing those courts altogether. We have, in times past, discussed this question with some members of that body on whose enactments all the federal courts, except the United States Supreme Court, depend for their existence.

[3] The case at bar seems to us an excellent illustration of the foregoing. The procedure at law in resistance to a tax is plain, adequate, and complete. It is found in section 13 of the Act of 1888 (P. L. 1888, p. 277), as amended by the revision of 1918, p. 881, § 704, and provides for a review by the state board of taxes and assessments (consolidated with the board of equalization by P. L. 1915, p. 438). The further remedy by certiorari in the courts of the state is too fundamental to require citation of authority. Nevertheless, because the exemption claimed may ultimately present a constitutional question, the government ignores these state departments and courts and applies to us. For a collection of cases contra this procedure, see Apartments Building Corp. v. Smiley (D. C.) 26 F.(2d) 469. And so usual has this method become that not even watchful counsel protest.

■■ The court, however, may enforce the objection sua sponte. Lewis v. Cocks (1874) 23 Wall. 466, 470, 23 L. Ed. 70; So. Pacific R. R. Co. v. United States (1906) 200 U. S. 341, 26 S. Ct. 296, 50 L. Ed. 507. Since the action of the court in that regard is controlled by the obviousness of the legal remedy (Duignan v. United States [1927] 274 U. S. 195, 47 S. Ct. 566, 71 L. Ed. 996), it becomes a matter of discretion. The balance of convenience in favor of the exercise of the jurisdiction as to part (viz., the 1920 assessments) of the bill in this case will, we hope, appear in the course of this opinion.

■ The court conceives it to be in the true interests of the city of Hoboken to exercise jurisdiction in so far as the tax for the year 1920 is involved. The court is convinced and understands that it has succeeded in convincing the municipal authorities —both legal and executive—that the principles of law governing the tax for that year are so clear that any appeal to the state administrative or judicial tribunals would only result in delay, increased expense, and no different result. The court will accordingly set forth these principles briefly, and then make bold to suggest some further theories which might be of interest both to the city and to the United States in any litigation in respect to the taxes for years subsequent to 1920.

■ It is agreed that real property of the United States, held either in its proprietary (as the cases say) or governmental capacity, is exempt from taxation. Tradition and precedent require this concession, both from counsel in this current case, and, in the past, from the New Jersey Legislature,

which, by section 203(2) of the Tax Act (Revision of 1918), declares it in so many words. P. L. 1918, p. 849.

In Warren's History of the United States Supreme Court, chapter 35, significantly, perhaps, entitled, "Increase in Nationalism," we find:

"In 1886, the rights of the United States, even within the territorial boundaries of the states, were broadly upheld in Van Brocklin v. Tennessee, 117 U. S. 151 [6 S. Ct. 670, 29 L. Ed. 845], in which the power of a state to tax real estate belonging to the national government was unequivocally denied."

Counsel has kindly furnished us with numerous more recent authorities, applying this principle and extending it to the property of that creature of recent, but almost mushroom, growth—the government-owned corporation. His trouble was unnecessary, because the cases are collected and discussed in an article in the Yale Law Journal, written with his usual thoroughness and power of analysis by Mr. Julius Henry Cohen (of interest to New Jersey because of his membership on the port authority). Yale Law Journal, vol. 34, No. 8. The earliest case, United States v. Coghlan, 261 F. 425 (D. C. Md. 1919), involved the attempt of a Maryland county to levy taxes upon land owned by the Shipping Board Emergency Fleet Corporation. This was specifically approved by the United States Supreme Court in Clallam County v. United States, 263 U. S. 341, 44 S. Ct. 121, 68 L. Ed. 328, where the state and county taxes of the state of Washington upon the property of the United States Spruce Production Corporation were canceled. In our circuit, the Circuit Court of Appeals has given its assent to this line of authority in two cases: United States Shipping Board Emergency Fleet Corporation v. Delaware County, Pa., 17 F.(2d) 40 (decided after Mr. Cohen's article), rehearing denied 25 F.(2d) 722 (Circuit Court of Appeals for the Third Circuit filed April 17, 1928); and United States v. New Brunswick, 11 F.(2d) 476, where assessments against real estate of the Emergency Fleet Corporation and of the United States Housing Corporation were set aside. The Supreme Court of the United States approved the general principle on the appeal of the last-named decision on April 9th of this year (48 S. Ct. 371, 72 L. Ed. 399), although reversing the court below on the ground that the property had already passed into private ownership. The most recent case is Lincoln County, Oregon, v. Pacific Spruce Corporation, 26 F.(2d) 435, where the above-cited cases and others of similar tenor are referred to and approved by the Circuit Court of Appeals for the Ninth Circuit.

This array of authority leaves the District Court no choice except obedience. He cannot help noting, however, a certain restiveness under some of the implications of the doctrine by several distinguished judges. In Panhandle Oil Co. v. Mississippi, 48 S. Ct. 451, 72 L. Ed. 857, four justices refused to follow the majority of the court in forbidding the state of Mississippi from imposing a gasoline tax on gasoline sold to the federal government for use of its Coast Guard fleet. In United States Shipping Board Emergency Fleet Corporation v. Delaware County, above cited, Judge Woolley dissented, and in the same case, on rehearing, Judge Buffington said:

"The inability of the county and township to tax these lands and have the government aid them in the educational and other service they did under the abnormal conditions of the war, necessitated by schools, etc., for children of government employees, makes the case one of hardship, *but relief therefrom does not lie with the courts, but the legislative branch of the government.*"

Elementary constitutional learning recognizes this doctrine, as well as another referred to earlier in this opinion, as the the product of the travail in which the country was born. The founders and their prophet, Chief Justice Marshall, had experienced the bitter results of state power and selfishness, and they were determined that the nation, once accomplished, should go forward unhampered. One might hazard a guess that the Chief Justice was unconsciously influenced by the milder, as a matter of fact, doctrine of the common law, that, since the crown was not bound by any statute whereby any prerogative, right, title, or interest belonging to it was divested or abridged, its property was exempt from taxation, unless rendered liable either by express words or necessary implication. Magdalene College Case (1616) 11 Coke Rep., 66b, 68b, 74b; Regina v. Cook (1790), 3 Tem. Rep. 519, 522; Urban District Council v. Hennell, [1902] 2 K. B. 73; Halsbury's Laws of England, vol. 7, p. 118.

The course of our history seems to have answered the fears of our great Chief Justice, and, in fact, perhaps to have given some cause, at least, for apprehensions of

an exactly opposite nature. If it has not, Mr. Justice Holmes, with his unfailing genius for expressing fundamentals in a striking phrase, would seem to have done it in his:

"The power to tax is not the power to destroy while this court sits."

The immunity of the sovereign from taxation would seem to belong to the legal philosophy of the Middle Ages ("l'etat c'est moi," and "the king can do no wrong"), and to be as unsuited to modern conditions as the immunity from suit, or the doctrine, "nullum tempus occurrit regi."

The history of the institution of the Court of Claims in this country, 34 Harvard Law Rev. 161, and of similar attempts to ameliorate the conditions under which British subjects deal legally with their government (Select Committees, 1921, 1924; London Times, Weekly Edition, week of July 16, 1928), indicates how reluctantly the ancient notions die.

■ Assuming, then, the existence of the exemption, counsel for the government seek to avoid its incidence by the contention that the piers were not, at the time of imposition of the tax, the property of the United States. During the argument, no particular stress was laid upon the exact date at which this issue should be determined. The chronologically embracive character of the bill made it seem unimportant. It is the view of the court that the issue in the interest of the city should be narrowed, until it includes only such questions as have already been authoritatively determined by controlling courts. For that purpose, it becomes essential to determine on what day in 1920 the title of the United States must be considered.

This is a question of local law, and an examination of the New Jersey cases reveals a finding of its highest court directly in point. In Jersey City v. Montville Township (1913) 84 N. J. Law, 43, 85 A. 838, affirmed without opinion 85 N. J. Law, 372, 91 A. 1069, the Supreme Court of New Jersey held, Mr. Justice Swayze writing the opinion: "The fact that the property is exempt at some time before the tax is payable is not important. Under our statutory scheme, taxes are imposed not for a particular year, calendar or fiscal, but on a particular day. * * * That day, in the case of the general property tax, is May 20th." The corresponding day, under the tax laws as revised in 1918, is October 1st. P. L. 1918, p. 859.

On this case being called by the court to the attention of the city solicitor, Mr. Allen, he, by letter of May 7, 1928, replied that he was unable to cite any case holding contrary thereto. As a matter of fact, a similar concession seems to have been made by the counsel for the city of New Brunswick, and to have received the approval of the United States Supreme Court, for we find in the opinion above cited: "The city concedes here that the assessments made to the purchasers for the year 1920 were invalid under the New Jersey law;" and, by way of footnote to the above: "This required the assessments for 1920 to be based on the ownership of the property on October 1 of the preceding year, at which time no sale contract had been made by the corporation."

■ We wish here to publicly record our appreciation of Mr. Allen's position. We regret to have to say we wish it were of more frequent occurrence. It is our opinion that the bar, or a portion of it, has an entire misconception of the client's right to a "day in court," and to this misinterpretation we attribute a great deal of what has justly been the dissatisfaction with our administration of justice. Obviously, a day in court does not mean an opportunity for an attorney to present any claim or defense, no matter how unworthy of belief he may think it. Further, we urge it also does not mean an oppportunity to put forward legal theories of whose unsoundness one is personally convinced. In criminal cases, such tactics are in large measure instrumental in bringing about the delay our crime commissions complain of. In civil cases, they have this added evil effect: Clients, often poor and ignorant, are permitted—nay, encouraged—to press claims which their attorneys know well are not recoverable at law. The attorney hopes to wear out the defendant and share (often excessively) in the result. He forgets that he more usually places upon the court—of which he is supposed to be an officer—the burden of denying to an individual who has actually suffered harm the relief he should never have been misled into hoping for. The inevitable result is that the courts incur the hostility, which, if it is based on reason, should be directed towards altering the existing law.

■ The city contends, then, that on October 1, 1919, the piers in suit were not the property of the United States. Its argument, in so far as it is pressed, is based on two distinct constitutional grounds. Both of these grounds this court thinks are un-

sound, and it understands that counsel concur in such opinion as applicable to the issue as it has been narrowed. One of these theories seems to the court to have been permanently foreclosed by recent decisions of the United States Supreme Court. The other, in a different form from that presented by the city, is in our judgment still open as to the taxes subsequent to 1920, and raises a far-reaching constitutional question.

The first matter can be quickly disposed of. It is said that the United States has not title to the pier property, because it was seized in violation of the Fifth Amendment of the United States Constitution. The court confesses that it is somewhat astonished at this suggestion. In the first place, the right of the city to raise the question at all seems extremely doubtful. The violation of the amendment here charged, namely, failure of the then German owners to be heard at the appraisal proceedings instituted under General Order No. 38 (as a matter of fact, these proceedings, report of which was forwarded to the Secretary of War on May 10, 1928, by the appraisal board, and of which the court obtained a copy, were very full, and it does not appear at all that the failure to be heard was the fault of any one but the owners) is surely purely personal to those owners, and to be taken advantage of only by them. 20 Corpus Juris, 641. It might render the title of the United States voidable, but not void.

▆ In the second place, the Fifth Amendment simply does not apply to the exact situation, and it has been so held by the United States Supreme Court repeatedly. In U. S. v. Chemical Foundation, 272 U. S. 1, at page 11, 47 S. Ct. 1, 5 (71 L. Ed. 131), the court said: "Congress was untrammeled and free to authorize the seizure, use or appropriation of such properties without any compensation to the owners. There is no constitutional prohibition against confiscation of enemy properties. Brown v. United States, 8 Cranch, 110, 122 [3 L. Ed. 504]; Miller v. United States, 11 Wall. 268, 305, et seq. [20 L. Ed. 135]; Kirk v. Lynd, 106 U. S. 315, 316 [1 S. Ct. 296, 27 L. Ed. 193]; Stoehr v. Wallace, 255 U. S. 239, 245 [41 S. Ct. 293, 65 L. Ed. 604]; White v. Mechanics' Securities Corp., 269 U. S. 283, 300 [46 S. Ct. 116, 70 L. Ed. 275]." United States v. Chemical Foundation, 272 U. S. 1, 11, 47 S. Ct. 1, 5 (71 L. Ed. 131). For a recent opinion, see Klein v. Palmer, 18 F.(2d) 932, 934 (C. C. A. 2).

We have not the space to discuss the philosophy of war expressed first after the Confiscation Acts of 1861 (50 USCA §§ 212, 213, 215) and 1862 (18 USCA §§ 2, 4) in Miller v. United States, 11 Wall. (78 U. S.) 286, 305, 20 L. Ed. 135. It was thus expressed by Mr. Justice Strong, who wrote the opinion in that case: "The whole doctrine of confiscation is built upon the foundation that it is an instrument of coercion, which, by depriving an enemy of property within reach of his power, whether within his territory or without it, impairs his ability to resist the confiscating government, while at the same time it furnishes to that government means for carrying on the war."

▆ And finally the question is res judicata. Certainly the city is in privity with the steamship companies in respect to the subject-matter of this litigation, and the judgments against the latter are accordingly binding on it. 34 Corpus Juris, 1009. Hart Steel Co. v. Railroad Supply Co., 244 U. S. 294, 37 S. Ct. 506, 61 L. Ed. 1148. Such judgments have been rendered as to both companies; the North German Lloyd in 61 Ct. Cl. 138 (in which Miller v. U. S., above cited, is followed—page 142), certiorari denied 270 U. S. 645, 46 S. Ct. 347, 70 L. Ed. 778, and the Hamburg-American in 59 Ct. Cl. 461, and 48 S. Ct. 470, 72 L. Ed. 822. In the last case Mr. Justice McReynolds said: "As Congress might have directed forfeiture of all property beneficially owned by enemy subjects, it had power to provide for seizure followed by such compensation as the President might determine."

▆ The city charges, also, that not only did the United States government exercise its power over the individual in a way forbidden by the Constitution, but also that it exercised a power over the state of New Jersey in a way that was equally unconstitutional. It says that the "consent of the Legislature," referred to in clause 17 of section 8 of article 1, was not secured for the transfer of the piers to the United States, and that its title is for that reason void.

One answer to that assertion is that the status of the piers on October 1, 1919, brings them within the implied terms of the general consent, rather than a specific act passed by the Legislature of this state in 1907. P. L. 1907, p. 43 (4 Comp. St. 1910, p. 5393, § 120). The title and section 1 of this act read as follows:

"An act ceding to the United States jurisdiction over lands acquired for public purposes within this state.

"1. The consent of the state of New Jersey is hereby given, pursuant to the provisions of article one, section eight, paragraph seventeen, of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any land within this state, for the erection of dock yards, custom houses, court houses or post offices or other needful buildings."

The language of the New Jersey Legislature is less militant, perhaps, than that of the Constitution, as appears by comparison, clause 17 reading:

"To exercise exclusive legislation in all cases whatsoever, over such district (not exceeding ten miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings;" "custom houses and court houses" being substituted for "forts, magazines, and arsenals."

This might be attributed to the fact that in 1907 war appeared less a reality than in 1787—a mistaken notion. Any attempt to draw a distinction between the various kinds of structures appropriate to the berthing of ships, or between buildings already standing or to be erected, would seem to be a quibble, even in the absence of the title. It is also one which the present defendant cannot press, in view of his insistence on the application of the provision. The title of the act, however, uses the inclusive and manifestly sensible phrase, "for public purposes."

What were the purposes for which the piers were used on October 1, 1919? They were all held under the jurisdiction of the War Department (none of them having been transferred to the Shipping Board until October 2, 1920, by Executive Order 3332). The first lease (under the authority conferred on the Secretary of War by Act of Congress of July 28, 1892, 27 Stat. at Large p. 321 [40 USCA § 303]) was entered into with the Panama Railroad Company on December 6, 1919. It will hardly be argued that the use by the War Department of the piers was not a public purpose. How vital a part of the prosecution of the war appears from the quoted telegram from the Quartermaster General, received to supplement the court's own recollection of the facts:

"North German Lloyd and Hamburg American piers referred to your telegram twelfth were used for return troops port of New York during period October first nineteen hundred nineteen to December thirty-first nineteen hundred twenty and lower level piers two three and four for return bodies same period.

"Cheatham QM General Washington."

We imagine that no one will be found to argue that these aftermaths of war—one joyous; the other tragic—are any less a part of the public purpose, which is war, than the preparations for and engagement in the struggle itself. As a matter of fact, it has already been so decided in respect to the battlefield and cemetery of Gettysburg. See United States v. Gettysburg Elec. Rlwy. Co., 160 U. S. 668, 16 S. Ct. 427, 40 L. Ed. 576.

A second answer to the contention that the United States had no power to condemn without the consent of the state is that there is no such constitutional limitation on the power of the federal government. Although, as we have seen, it is not necessary to a decision, we shall discuss this attempted interpretation of the Constitution in the hope that it may not be again urged.

The point can be thus summed up: Because the phrase, "purchased with the consent of the Legislature," occurs in a part of the Constitution where the *power* to exercise *exclusive legislation* (jurisdiction) over certain places is given to the Congress, therefore that body has no power *to acquire title* to *any* place, except with such consent. The mere statement of this proposition would seem to us to carry its own refutation and disclose its character as a complete *non sequitur.*

The constitutional provision contains no express prohibition. When such was their intention, the "framers" had no hesitation in speaking out. They did so in the section following the one under consideration, and again in the amendments comprising the "Bill of Rights."

Resort must then be made to the argument that, having been given this express power with reference to certain lands, therefore the powers of Congress are exhausted in the premises, and that no other lands can be acquired in any other way. This theory overlooks two essential factors:

First, the subject to which the claim is

directed is not the acquisition of legal title at all, but the exercise of jurisdiction—an entirely different matter. This appears from the plain words employed. The cases from the beginning have acknowledged this distinction, and have interpreted "to exercise like authority" to mean jurisdiction. In United States v. Cornell (1819) Fed. Cas. No. 14,867, Mr. Justice Story said:

"But, although the United States may well purchase and hold lands for public purposes, within the territorial limits of a state, this does not of itself oust the jurisdiction of sovereignty of such state over the lands so purchased. It remains until the state has relinquished its authority over the land either expressly, or by necessary implication."

And see State v. Morris, 76 N. J. Law, 222, 68 A. 1103; Battle v. U. S., 209 U. S. 36, 28 S. Ct. 422, 52 L. Ed. 670; Steele v. Halligan (D. C.) 229 F. 1015.

It further appears, from the history of the clause as it is shown in the journal of the federal convention (Elliot's Debates, vol. 1) and the report by Madison of the Debates (Elliott, vol. 5). A reading of these volumes indicates that clause 17 was included for the first time in the revised draft of the Constitution, reported September 12, 1787, by the committee of revision (popularly known as the committee of eleven). Elliot, vol. 1, p. 298. It is not found in the draft of the Constitution reported by the committee of five (known as the committee of detail), that draft stopping at clause 16. It had, however, been foreshadowed in the proceedings on two occasions.

It was included in the following among the powers of Congress in General Pinckney's Draft (Plan) of a Constitution. Elliot's Debates, vol. 1, p. 137, and volume 5, p. 129: "To provide such dock yards and arsenals, and erect such fortifications, as may be necessary for the United States, and to exercise exclusive jurisdiction therein; * * * to provide for the establishment of a seat of government for the United States, not exceeding ——— miles square, in which they shall have exclusive jurisdiction" (article VI, Plan of a Federal Constitution; Elliot's Debates, vol. 5, p. 130), which plan (draft) was itself referred to the committee of five. Elliot's Debates, vol. 1, p. 217, and volume 5, p. 263.

A, similar provision was one of the suggestions made by Mr. Madison on August 18, and also referred to the committee of eleven, as follows:

"August 18—Madison submitted an order to be submitted to the committee of detail, the following powers as proper to be added to those of the general Legislature:

"Ninth—To authorize the executive to procure, and hold, for the use of the United States, landed property, for the erection of forts, magazines, and other necessary buildings." Elliot's Debates, vol. 5, p. 440.

From those passages it is abundantly clear that the authors of the Constitution had expressly in their minds both kinds of control—ownership (proprietary) and jurisdiction (governmental). Having rejected the first alternative, we cannot, on familiar principles, read it into their adoption of the second.

This leaves the Constitution barren of any express grant of power to the national government to acquire and hold property. As a footnote to the passage from the chapter on the increase of nationalism from Warren's History of the Supreme Court, quoted earlier in this opinion, we find the first case in that court in which the question was squarely presented—Kohl v. United States, 91 U. S. 367, 23 L. Ed. 449. The passage there quoted reads as follows:

"The right [to acquire land by eminent domain] is the offspring of political necessity; and it is inseparable from sovereignty, unless denied to it by its fundamental law. Vattel, c. 20, 34; Bynk., lib. 2, c. 15; Kent's Comm. 338–340; Cooley on Const. Lim. 584 et seq. But it is no more necessary for the exercise of the powers of a state government than it is for the exercise of the conceded powers of the federal government."

And earlier in the opinion:

"The powers vested by the Constitution in the general government demand for their exercise the acquisition of lands in all the states. These are needed for forts, armories, and arsenals, for navy yards and lighthouses, for customhouses, post offices, and courthouses, and for other public uses. If the right to acquire property for such uses may be made a barren right by the unwillingness of property holders to sell, or by the action of a state prohibiting a sale to the federal government, the constitutional grants of power may be rendered nugatory, and the government is dependent for its practical existence upon the will of a state, or even upon that of a private citizen."

In Stockton v. Baltimore & N. Y. R. R. Co. (C. C.) 32 F. 11, the very objection made here was put forward by the state of New Jersey by its Attorney General, and Mr. Justice Bradley, sitting in his own circuit, decided contra, and said:

"The consent of a state may sometimes

*facilitate the execution of a power,* as the consent to the use of the prisons, court-houses, and other public buildings of the state; but it can never confer power."

And again:

"One argument for the position is that no part of the territory of one sovereign can be acquired by another except by conquest or cession; and therefore, in a case like the present, where conquest is out of the question, it can only be acquired by cession; and this conclusion is supposed to be affirmed and provided for in our federal system by the seventeenth paragraph of section 8, art. 1, Const., which gives to Congress power to exercise exclusive legislation 'over all places purchased by the consent of the Legislature of the state in which the same shall be, for the erection of forts, magazines, arsenals, dock yards, and other needful buildings.' It is argued that this is the only constitutional method by which the United States government can obtain the possession and use of lands within a state, especially of lands. belonging to the state.

"The argument, however, is directed to the acquisition of territory, with exclusive jurisdiction over the same, and is entirely sound in that regard. But it does not touch the question as to the power of the United States to acquire the mere use of land without exclusive jurisdiction therein. Nearly all the powers of government are exercised over territory in which the United States and the several states have concurrent jurisdiction. It is only in exceptional cases that the United States desires to have exclusive jurisdiction, and a consequent cession of territory. It is very true that the consent of the state Legislature is required in order to give the United States this exclusive jurisdiction. But that is all. It is not required when exclusive jurisdiction is not sought."

The court feels that zealous counsel have been misled into pressing this interpretation of clause 17 by two passages their learning has produced. The same misapprehension, based on the same two authorities, was corrected by the Circuit Court of Appeals for another circuit. Curiously enough, this court was not cited by either side to the opinion of the court below or that reversing it. They are found sub nomine Williams v. Arlington Hotel Co., 15 F.(2d) 412 (D. C.), and 22 F. (2d) 669 (C. C. A.).

In Fort Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264, affirming 27 Kan. 749, the court says, and the city repeats in its brief:

"Such cession is really as much for the benefit of the state as it is for the benefit of the United States. It is necessarily temporary, to be exercised only *so long as the places continue to be used for the public purposes* for which the property was acquired or reserved from sale."

And they then argue, as we understand them, that the place here considered is no longer "used for a public purpose" (not so concededly as to October 1, 1919, and doubtful anyway), and so the title of the United States reverts. The fallacy in this view has, we hope, been already demonstrated; but, in so far as the Leavenworth Cases are concerned, counsel have overlooked the fact that the point for decision was only the power of a state to make a cession, and that the opinion of Mr. Justice Field reaffirms by way of dicta the principle already laid down in Kohl v. United States, above cited.

In the opinion above referred to, Williams v. Arlington Hotel Co., supra, quotes the following excerpt from Elliot's Debates:

"So much of the fourth clause as related to the seat of government was agreed to nem. con. On the residue, to wit, 'to exercise like authority over all places purchased for forts, etc.':

"Mr. Gerry contended that this power might be made use of to *enslave* any particular state by buying up its territory, and that the strongholds proposed would be a means of awing the state into an undue *obedience* to the general government.

"Mr. King thought himself the provision unnecessary, the power being already involved, but would move to insert, after the word 'purchased,' the words, 'by the consent of the Legislature of the state.' This would certainly make the power safe.

"Mr. Governeur Morris seconded the motion, which was agreed to nem. con., as was then the residue of the clause as amended."

Elliot's Debates, vol. 5, p. 511. (Italics ours.)

This is also included in the thorough brief of counsel for Hoboken, and is adduced to prove that the framers feared the very thing now in contemplation by the federal government. That they very well might have feared it we agree, and we are heartily in sympathy with the learned District Judge's alarm at the possibility of the wholesale transfer of state lands to the United States, if they are to be tax-exempt. The remedy, as we see it, lies not, however, in a free interpretation of clause 17, but, as we have

said, in a changed attitude toward the problem, either on the part of the higher courts, or, failing them, the national Legislature.

That, however, they did not fear it is apparent both from the language of Mr. Gerry and from the debates in the state conventions which ratified the Constitution. Governor Gerry used the words "enslave" and "obedience." Standing alone, "enslave" might perhaps be made to refer to economic slavery, and, therefore, to the conditions arising from the wholesale tax exemptions at the expense of the states. Combined with obedience, it is certain that Mr. Gerry had reference to the subjection of the citizens of the several states to the police powers of the federal government—an idea abhorrent to the "state's-righters" of those days.

That the matter was regarded in the same light by the other participants in the constitutional convention is apparent from their explanations to their constituents—the state delegates called upon to ratify. Those opposing and those favoring the clause both make it equally clear that they are concerned with enslavement in the political sense. So Mr. George Mason and Mr. G. Livingston say:

"Mr. George Mason thought that there were few clauses in the Constitution so dangerous as that which gave Congress exclusive power of legislation within ten miles square. Implication, he observed, was capable of any extension, and would probably be extended to augment the congressional powers. But here there was no need of implication. This clause gave them an unlimited authority, in every possible case, within that district. 'This ten miles square,' says Mr. Mason, 'may set at defiance the laws of the surrounding states, and may, like the custom of the superstitious days of our ancestors, become the sanctuary of the blackest crimes. Here the federal courts are to *sit*.' (We hope also a *non sequitur*.) (Italics ours.)

"'Now, sir, if an attempt should be made to establish tyranny over the people, here are ten miles square where the greatest offender may meet protection. If any of their officers, or creatures, should attempt to oppress the people, or should actually perpetrate the blackest deed, he has nothing to do but get into the ten miles square. Why was this dangerous power given? Felons may receive an asylum there and in their strongholds.'"
Elliot, vol. 3, p. 431.

\* \* \* \* \* \* \* \* \*

"Mr. G. Livingston: 'What will be their situation in a federal town? Hallowed

ground! Nothing so unclean as state laws to enter there, surrounded, as they will be, by an impenetrable wall of adamant and gold, the wealth of the whole country flowing into it.' (Here a member, who did not fully understand, called out to know what wall the gentleman meant; on which he turned, and replied: "A wall of gold—of adamant, which will flow in from all parts of the continent." At which flowing metaphor, a great laugh in the house.) The gentleman continued: 'Their attention to their various business will probably require their constant attendance. In this Eden will they reside with their families, distant from the observation of the people. In such a situation, men are apt to forget their dependence, lose their sympathy, and contract selfish habits. Factions are apt to be formed, if the body becomes permanent. The Senators will associate only with men of their own class, and thus become strangers to the condition of the common people.'" Elliot, vol. 2, pp. 287, 288.

And Mr. Nicholas and Mr. Pendleton answer them:

"Mr. Nicholas insisted that as the state, within which the ten miles square might be, could prescribe the terms on which Congress should hold it, no danger could arise, as no state would consent to injure itself; there was the same security with respect to the places purchased for the erection of forts, magazines, etc. Elliot, vol. 3, p. 431.

"Mr. Pendleton: 'But it gives them power over the local police of the place, so as to be secured from any interruption in their proceedings. Notwithstanding the violent attack upon it, I believe, sir, this is the fair construction of the clause. It gives them power of exclusive legislation in any case within that district. What is the meaning of this? What is it opposed to? Is it opposed to the general powers of the federal Legislature, or to those of the state Legislatures? I understand it as opposed to the legislative power of that state where it shall be. What, then, is the power? It is that Congress shall exclusively legislate there, in order to preserve the police of the place and their own personal independence, that they may not be overawed or insulted, and of course to preserve them in opposition to any attempt by the state where it shall be. This is the fair construction. Can we suppose that, in order to effect these salutary ends, Congress will make it an asylum for villains and the vilest characters from all parts of the world? Will it not degrade their own dignity to make it a sanctuary for villains?

I hope that no man that will ever compose that Congress will associate with the most profligate characters.'" Elliot, vol. 3, p. 441.

It is to be remarked that Mr. Patrick Henry also links the ten miles square and the "strongholds." Elliot's Debates, vol. 3, p. 435.

As we have intimated, it is our opinion that the city could have made, and can, of course, if it sees fit, still make, an attack on the exemption claimed for the years subsequent to 1920, at least, which has more chance of success in the courts. By so doing, they would raise a constitutional question of paramount importance and one which is of an increasing timeliness.

■ This question, so far as we know, has never been passed on by the courts. It is whether the constitutional power of Congress permits the government to engage in the shipping business. How such an important issue would be determined by the highest courts we do not presume to say. We do not mean whether or not the operation of ships is a public (as distinguished from a private) purpose, in the sense in which that term is used in the law of eminent domain. 10 R. C. L. 21. It undoubtedly is. The Pesaro, 271 U. S. 562, 46 S. Ct. 611, 70 L. Ed. 1088; Whan v. Green Star S. S. Corp. (C. C. A. 2d, 1927) 22 F.(2d) 483.

■ We further do not consider that any question of "government ownership" is involved. Whether any nation or other governmental unit should engage in private enterprise, is, of course, a political (in the sense that it concerns the legislative department of a government) question, about which the courts are not concerned. A flood of propaganda and some analytical studies have been issued on the subject. We have been surprised that so little attention was directed to making a comparison of costs to the consumer under both forms of operation. Such a study in respect to the uses of the greatest of all natural resources—water—would seem to be particularly timely.

■ In our system of enumerated powers, any activity of the federal government must find its justification in the terms—express or implied—of the Constitution. It becomes pertinent, then, to examine the entrance of the United States into the shipping business in that aspect, and see whether we find any express or implied power granted to Congress which authorizes its participation in that field. Is or is it not within the sphere of federal control?

The magnitude of this task need not ap-

pall the city of Hoboken, when they consider that a single taxpayer of the state of Illinois attempted to restrain the construction of the Panama Canal. Wilson v. Shaw, Secretary of the Treasury, 204 U. S. 24, 27 S. Ct. 233, 51 L. Ed. 351. We are not unaware of the ruling of the Supreme Court in the case of Massachusetts v. Mellon, 262 U. S. 447, 43 S. Ct. 597, 67 L. Ed. 1078 (opinion by Mr. Justice Sutherland), wherein that court refused to enjoin the appropriations authorized under the Sheppard-Towner Act of 1921 (42 Stat. 224 [42 USCA §§ 161–174]), on the ground that neither the taxpayer nor the state was sufficiently injured by the operation of the statute to warrant the court in the exercise of any jurisdiction. We should suppose, however, that the city, by making an assessment, would be entitled to question the constitutionality of the operations of the government on which its exemption must be claimed. It is to be noted that the original shipping acts, 46 USCA § 801, and the two Merchant Marine Acts of 1920 and 1928, 46 USCA § 861, and Pamphlet Supplement USCA § 891, all contain references to the national defense or to the use of ships as naval or military auxiliary or both. These references may indicate the Congress' own view that the powers assumed are implied in their "war powers," or, perhaps, as part of the powers appertaining to sovereignty rather than obtained from the commerce clause. It may also be argued that the shipping, or, for that matter, almost any other business, comes within the meaning of the general welfare clause of the Constitution. Article 1, § 8, cl. 1.

The budget for the next year as reported in the public press (a budget made up under the supervision of a most careful director and a Chief Executive whose efforts for economy and efficiency have signally gained the approbation of his countrymen) may well cause us to wonder to what uses the money to be appropriated is to be put. This would seem to be of interest more especially to those who pay least directly in rents and consumer's costs, and for that very reason can least afford the burden imposed. The answer, perhaps, lies, in part anyway, in the very problem whose legal angles the court is attempting to suggest. In other words, how wide an interpretation is to be given to the general welfare clause.

Mr. Warren, in the same chapter (Increase of Nationalism) already twice adverted to, quotes Mr. Justice Bradley, speaking in B. & O. R. R. v. Maryland, 21 Wall. 456, 474, 22 L. Ed. 678 (1875):

"Whether, in addition to this, Congress, under the power to establish postroads, to regulate commerce with foreign nations, and among the several states, and to provide for the common defense and general welfare, has authority to establish and facilitate the means of communication between the different parts of the country, and thus to counteract the apprehended impediments referred to, is a question which has exercised the profoundest minds of the country. This power was formerly exercised in the construction of the Cumberland road and other similar works. It has more recently been exercised, though mostly on national territory, in the establishment of railroad communication with the Pacific Coast. But it is to be hoped that no occasion will ever arise to call for any general exercise of such a power, if it exists."

And later on in the same chapter he says:

"In 1888, twenty-five years after the first national railroad charter had been granted, the court, in a striking opinion by the same distinguished jurist (California v. Central Pacific R. R. Co., 127 U. S. 1 [8 S. Ct. 1073, 32 L. Ed. 150]), held the power to establish highways and bridges to be essential to Congress' complete control and regulation of interstate commerce. Thus was settled the great question of internal improvements which since the early years of the nation had been a subject of sharp political division."

That the "great question" was not as settled as Mr. Warren avers might be inferred from the discussions which are continuing to the present day, and which may continue beyond it, if the present defendant is so minded.

George Ticknor Curtis, one of the great constitutional lawyers of his day, and the author of a notable book on the History and Origin of the Constitution, delivered a lecture before the Law School of Georgetown University on February 16, 1885. In the course of it, he said:

"But I will detain you no longer upon this singular notion of the general welfare, excepting to remark that there are now large establishments in this government on which great sums are expended every year, and which rest on no better constitutional foundation than this strange idea of the general welfare clause."

In 1917, the President of the American Bar Association was the then United States Senator from Utah, Mr. Sutherland. Any student of the opinions delivered since his elevation to the Supreme Court will realize that even his unofficial utterances are entitled to the greatest weight. On the occasion of his annual address to the Association at Saratoga Springs, Mr. Justice Sutherland remarked:

"Whatever may be said as to the power of a particular state or municipality to engage in some specific business activity, I have never been able to understand how the federal government, with its precisely enumerated and delegated powers, may constitutionally engage in business. Warrant may be found in the post office clause for the operation of telephone and telegraph lines, but the only authority, even under the most strained construction, that can be cited as authorizing the government of the United States to become a common carrier of goods and passengers by land or sea is the commerce clause, which gives Congress power to regulate interstate and foreign commerce. I have upon another occasion discussed this question at some length, and I shall not undertake to go into it now further than to say that the power which is conferred is to regulate, not to do the substantive thing, which is the subject of regulating. To build a highway, or even a railroad, may be accepted as a regulating of commerce, since its effect is to facilitate commerce, and thus to condition or regulate it, but the building of a road and the carrying of passengers over the road are two very different things. The building of the railroad may regulate commerce, but the carrying of passengers and goods over the road is commerce itself, and under our system always regarded as a private activity, as distinct from a governmental function. * * * Had it been suggested to the framers of the Constitution that provision should be made whereby the federal government might engage in the carrying trade or in any other form of private as distinguished from governmental business, certainly the suggestion would have been instantly and emphatically rejected."

On the other hand, eminent thinkers on constitutional problems have expressed a contrary view. In McDonald's recent book on Federal Aid we find him, after listing the numerous federal statutes granting sums of money to the states, saying:

"The rapid growth of federal aid has forced itself upon the attention of men in public life. Leaders of public opinion agree that it is one of the outstanding developments of federal administration, but their views are widely divergent as to the merits of the principles involved. * * * But only within the last two decades has the fed-

eral government adopted the policy of purchasing with federal funds a considerable measure of supervision over numerous governmental activities not mentioned in the Constitution, and therefore presumably left in the hands of the states. * * * The inflexible nature of the Federal Constitution has been in large measure responsible for the rapid development of this system of grants and subsidies from the federal treasury to the state governments. The powers of Congress have expanded but little, while national problems have increased at an astonishing rate."

Professor Corwin, of Princeton University, whose brilliant studies in constitutional history and law are familiar to both the profession and the general public, has contributed an article on the subject to the Harvard Law Review for 1922–1923 (36 H. L. R. 548), which he has entitled, "The Spending Power of Congress." This article was occasioned by the decision of the Supreme Court in the case of United States v. Mellon, supra.

The learned professor sets forth the various statutes making appropriations not clearly authorized by the enumerated powers, beginning with the early "internal improvements" (the Cumberland road), and the first bureau for the collection of agricultural statistics, down through the Federal Farm Loan Act (whose validity was sustained in Smith v. Kansas City Title & Trust Co., 255 U. S. 180, 41 S. Ct. 243, 65 L. Ed. 577), and the various acts granting assistance to education. He sets forth the views of the early Presidents and other leaders on the subject of the general welfare clause, and concludes:

"What weight should be given to the Madisonian doctrine that the national government's field of expenditure is precisely coextensive with the field of its other powers? The logical difficulties in the way of this proposition were pointed out by Story and his arguments need not be repeated. The historical difficulties are not less formidable. The only period when the doctrine was at all generally accepted was that between 1845 and 1860, when state's rights principles were dominant with all sections and parties. Of the earlier Presidents, every one who put himself officially on record, Madison alone excepted, avowed the literal view of the 'general welfare' clause, qualified to be sure after 1800, first by the doctrine of state consent and later by a *general caveat against jurisdictional rights following in the wake of appropriations.* But neither of these qualifications touches the Maternity Act in any way, nor does the logic of later decisions support them. And the verdict to be drawn from the practice of Congress is substantially the same. The validity of 'internal improvements' was finally rested on views of the war, commercial, and postal powers which had not occurred to early champions of national expenditures for this purpose, or were repudiated by them, and probably rivers and harbors appropriations may be similarly justified. Not so, however, of the ever-mounting sums which have been voted through more than eighty years for the encouragement of agriculture, and through more than sixty years—though only more recently from the general funds—for education within the states. Certain it is that any attempt to apply the Madisonian test to national expenditures to-day would call for a radical revision in the customary annual budget of the government and for a revolution in national administration. Yet with the Madisonian doctrine counted out, what other test is there with which, in any reasonably probable case, the court could confront a congressional appropriation without palpably invading the field of legislative discretion? We must conclude that into the 'dread field' of money expenditure the court may not 'thrust its sickle'; that, so far as this power goes, the 'general welfare' is what Congress finds it to be." 36 H. L. R. 578, 579.

Other arguments, pro and con, are to be found in the exhaustive briefs submitted by counsel in Massachusetts v. Mellon, supra, and in Smith v. Kansas City Title & Trust Co., supra (Mr. Hughes submitted the case in favor of validity).

Any opinion by this court on the question would surely be but a first step. It would have been our duty to give it, if the issue had been directly presented. We have outlined some thoughts on the subject to the best of our ability, in the desire to make available to both sides in the current litigation the results of whatever work we have done. ▄▄ Only one other matter remains. It will be observed that at the beginning of this opinion we set forth the clauses in the grant to and from the city of Hoboken in the case of piers 1, 2, and 3. These quite plainly prescribe the use of the lands under water on which the piers were built, and forbid the obstruction of the public view or access thereof. The erection of the piers might well be a violation of this condition. We say "condition," because the language used precludes its construction as a base or determinable fee. Board of Chosen Freeholders of Cumberland County v. Buck, 79 N. J. Eq. 472, 82 A. 418.

If that is so, we should think the state of New Jersey had a right of entry for condition broken. 13 Cyc. 711. The covenant would run with land, it would be breached "for inconsistent use," and the present occupant would take subject thereto. We do not pretend to have knowledge of the mysteries of real property law involved in this suggestion, but we submit it for study by the state of New Jersey.

In conclusion, the court finds that the United States Shipping Board is entitled to exemption from taxation for the year 1920. It regards the use of the piers on that date as under the war powers of the federal government. The court refuses to pass on the question for the years subsequent to 1920, for the reason that it feels those issues should be disposed of in the departments of the state of New Jersey—administrative or judicial.

It has suggested that in any further proceedings the following questions might profitably be discussed: The distinction referred to by Mr. Julius Cohen, in his article above cited, between proprietary and governmental activities as a method of avoiding the effect of the many decisions conceding tax exemptions; the power of the federal government to engage in the shipping business; and, as to piers 1, 2, and 3, the legality of taxing the leases to the private steamship lines and the rights of the state of New Jersey in the premises.

The rule will be made absolute in so far as the relief asked for in paragraph B of the government's bill, from the beginning of the paragraph to the word "thereon" on line 18 thereof (covering the taxes for the year 1920 imposed by resolution of the city council dated November 1, 1927). In all other respects, both the rule and the injunction heretofore granted will be discharged.